## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JUDGE PAULEY

———————————————————x
MICHAEL G. BRAUTIGAM, an individual ,  :

                     :

         Plaintiff,        :

                     :

   vs.                 :

LLOYD C. BLANKFEIN, JOHN H.  :
BRYAN, GARY D. COHN, CLAES  :
DAHLBACK, STEPHEN FRIEDMAN,  :
WILLIAM W. GEORGE, JAMES A.  :
JOHNSON, LOIS D. JULIBER,  :
LAKSMI N. MITTAL, JAMES J.  :
SCHIRO, DAVID VINIAR, LARRY  :
B. LITTON, JR., RAJAT K. GUPTA,  :
RUTH J. SIMMONS, H. LEE SCOTT, JR.,  :

           Defendants,    :

                     :

          and        :

                     :

GOLDMAN SACHS GROUP, INC.  :

                     :

       Nominal Defendant.  :
———————————————————x

Civil Action No. **CIV 4544**

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY

RECEIVED
JUL 01 2011
U.S.D.C. S.D.N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

Plaintiff Michael G. Brautigam ("Plaintiff"), by and through his attorneys, derivatively on behalf of nominal defendant The Goldman Sachs Group, Inc. ("Goldman" or the "Company"), submits this Verified Shareholder Derivative Complaint against the defendants named herein.  Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief developed from the investigation and analysis of his counsel, which include, among other things, public filings by Goldman with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, matters of public record available from various state and federal government websites, complaints pending against the Company in state

1

and federal courts, and other information available in the public domain. To the best of Plaintiff's knowledge, information, and belief, the allegations herein not based on personal knowledge are likely to have evidentiary support after a reasonable opportunity for further investigation, discovery, and analysis.

## I.    SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought on behalf and for the benefit of Goldman against certain of its current and former directors. The recipient of some $10 billion of federal government bail-out monies, Goldman has suffered, and will continue to suffer, serious financial and reputational impacts from the inadequate servicing of troubled residential mortgage loans.

2.    Goldman finds itself in this predicament because the Individual Defendants named herein breached their fiduciary duties of loyalty to the Company and its shareholders from at least January 1, 2009 to the present (the "Relevant Period"). Specifically, they failed to implement and maintain adequate internal controls to manage the foreseeably immense financial fall-out from inadequate residential mortgage loan underwriting standards, even though:  (a) during late 2007 they discussed the mortgage crisis and the Company's tactical positioning related thereo, including the fact that the Company's subprime mortgage business had billions of dollars of short positions; (b) during late 2008, they reviewed and approved the Company's agreement with federal regulators to work diligently to modify terms of residential mortgages as appropriate to strengthen the health of the U.S. housing market; (c) they knew of the Company's settlements with *inter alia* the Attorney General of the Commonwealth of Massachusetts that related to her investigation into aspects of the Company's residential mortgage-related business; and, (d) they caused the Company to make mortgage-related risk disclosures in its SEC filings throughout the Revlevant Period.  Moreover, these defendants have utterly failed and refused to pursue pecuniary relief for the Company against any of the wrongdoers.

3.     The Individual Defendants have now exposed Goldman to having to participate in a potential settlement with the Attorneys General of several states in which the Company may pay a share of billions of dollars sought by the Attorneys General related to alleged improper residential mortgage loan servicing practices.

4.     As a result of the Individual Defendants' consciously willful inaction, Goldman not only failed to pursue remedies against those who were responsible for the misconduct alleged herein, it also failed to devote adequate resources to the management of billions of dollars of troubled loans owned or serviced by the Company.  As a result, the Company has suffered, and will continue to suffer, huge amounts of damages from, *inter alia*, (a) losses associated with foreclosure proceedings that have been delayed, dismissed, and/or refiled due to improperly-documented ownership interests; (b) expenditures related to the defense of put-back,[1] homeowner, and robo-signer litigation commenced against the Company or its subsidiaries during the Relevant Period; (c) book value losses to its mortgage servicing rights; (d) expenditures related to the fourth quarter interagency review of Goldman's foreclosure policies and practices conducted by the OCC, the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision; (e) monies that it will be obligated to repay to borrowers in connection with financial injury caused by errors, misrepresentation, or other improper foreclosure practices; and (f) reputational damages.

---

[1] "Putback" litigation refers to complaints filed against the Company by large purchasers of residential mortgage-related securities in state and federal courts alleging that the offering documents for the securities that they purchased contained untrue statements of material facts and material omissions and generally seeking rescission and damages.  The plaintiffs in these cases include the Federal Home Loan Banks of Seattle, Chicago, and Indianapolis, The Charles Schwab Corporation, Cambridge Place Investment Management Inc., Basis Yield Alpha Fund (Master), and Landesbank Baden-Wurttember, among others.

## II.     JURISDICTION AND VENUE

5.     This Court has jurisdiction over all counts alleged herein pursuant to 29 U.S.C. §1332(a)(2) in that Plaintiff and all defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  This action is not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.  This Court has supplemental jurisdiction over the state law causes of action alleged herein pursuant to 28 U.S.C. §1367(a).

6.     Venue is proper in this Court and the Southern District of New York pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of occurred in the Southern District of New York, and certain of the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect here.

## III.    PARTIES

7.     Plaintiff Michael G. Brautigam was a shareholder of Goldman common stock at all times during the Relevant Period, and is a current shareholder of the Company.  He is a citizen of the state of Ohio.

8.     Nominal defendant Goldman is organized under the laws of the State of Delaware and has its principal executive offices at 200 West Street, New York, New York.  Goldman is a leading global investment banking, securities, and investment management firm that provides a wide range of financial services to a client base that includes corporations, financial institutions, governments and high-net-worth individuals. Goldman reports its activities in four business segments:   Investment Banking; Institutional Client Services; Investing & Lending; and Investment Management. Goldman conducts residential mortgage servicing through its Litton Loan Servicing, LP ("Litton") subsidiary.

9.      Defendant Lloyd C. Blankfein has been a director of Goldman since April 2003 and, since June 2006 he has served as its Chairman and Chief Executive Officer. Between January 2004 and June 2006, Mr. Blankfein served as the Company's Chief Operating Officer.  Upon information and belief, Mr. Blankfein is a citizen of New York.

10.     Defendant John H. Bryan has been a Goldman director since 1999.  He chairs Goldman's Corporate Governance and Nominating Committee and is a member of all other standing committees.  The Board determined that he qualified as an audit committee financial expert as defined by the SEC.  His experience includes tenures as Chairman and Chief Executive Officer of Sara Lee Corporation.  Mr. Bryan, as the Chair of the Corporate Governance and Nominating Committee, is designated as the Presiding Director of the Company's Board of Directors.  Upon information and belief, Mr. Bryan is a citizen of Illinois.

11.     Defendant Gary D. Cohn has been a director of Goldman since June 2006 and, since June 2006 he has served as its Chief Operating Officer (or Co-Chief Operating Officer).  Before assuming the Chief Operating Officer role, Mr. Cohn was co-head of Goldman's global Securities businesses.  Upon information and belief, Mr. Cohn is a citizen of New York.

12.     Defendant Claes Dahlback has been a director of Goldman since June 2003 and is a member of all standing committees of its Board of Directors. The Board determined that he qualified as an audit committee financial expert as defined by the SEC.  His experience includes tenures as President and Chief Executive Officer, Vice-Chairman, Chairman, and Senior Advisor to Investor, AB, a Swedish-based investment company.  Upon information and belief, Mr. Dahlback is a citizen of Sweden.

13.     Defendant Stephen Friedman has been a director of Goldman since April 2005.  He chairs Goldman's Risk Committee and is a member of all other standing committees of the Board of Directors. The Board determined that he qualified as an audit committee financial expert as defined by the SEC.  Mr. Friedman's experience includes

tenures as Chairman of the Federal Reserve Bank of New York and Chairman of Stone Point Capital, a private equity firm.  Upon information and belief, Mr. Friedman is a citizen of New York.

14.    Defendant William W. George has been a director of Goldman since December 2002 and is a member of all standing committees of its Board of Directors. The Board determined that he qualified as an audit committee financial expert as defined by the SEC. His experience includes tenures as President of Litton Microwave Cooking, Executive Vice President of Honeywell International, and President, Chief Operating Officer, Chief Executive Officer, and Chairman of Medtronic, Inc.  Upon information and belief, Mr. George is a citizen of Massachusetts.

15.    Defendant James A. Johnson has been a director of Goldman since May 1999.  He chairs Goldman's Compensation Committee and is a member of all other standing committees of its Board of Directors. The Board determined that he qualified as an audit committee financial expert as defined by the SEC.  His experience includes tenures as Chairman and Chief Executive Officer of Fannie Mae, Chairman and Chief Executive Officer of Johnson Capital Partners and Vice Chairman of Perseus LLC.  Upon information and belief, Mr. Johnson is a citizen of Idaho.

16.    Defendant Lois D. Juliber has been a director of Goldman since March 2004 and is a member of all standing committees of the Board of Directors. The Board determined that he qualified as an audit committee financial expert as defined by the SEC.  Her experience includes Chief Operating Officer and Vice Chairman of Colgate-Palmolive Company.  Upon information and belief, Ms. Juliber is a citizen of New York.

17.    Defendant Laksmi N. Mittal has been a director of Goldman since June 2008 and is a member of all other standing committees of its Board of Directors. The Board determined that he qualified as an audit committee financial expert as defined by the SEC.   His experience includes Chairman and Chief Executive Officer of ArcelorMittal S.A.  Upon information and belief, Mr. Mittal is a citizen of Luxembourg.

18.     Defendant James J. Schiro has been a director of Goldman since May 2009. He chairs the Audit Committee and is a member of all other standing committees of the Board of Directors. The Board determined that he qualified as an audit committee financial expert as defined by the SEC.  His experience includes Chief Executive Officer of PricewaterhouseCoopers LLP and as Chief Operating Officer and Chief Executive Officer of Zurich Financial Services.  Upon information and belief, Mr. Schiro is a citizen of New Jersey.

19.     Defendant David Viniar has been an Executive Vice President and the Chief Financial Officer of Goldman since May 1999.  He has been Goldman's head of Operations, Technology, Finance and Services Division since December 2002.  Upon information and belief, Mr. Viniar is a citizen of New Jersey.

20.     Defendant Larry B. Litton, Jr., is the President and Chief Executive Officer of Goldman's Litton Loan Servicing, overseeing the day-to-day operation of Litton's $75 billion mortgage servicing portfolio.  Upon information and belief, Mr. Litton is a citizen of Texas.

21.     Defendant Rajat K. Gupta was a director of Goldman from November 2006 until his term ended in May 2010 and was a member of all standing committees of its Board of Directors.  The Board determined that he qualified as an audit committee financial expert as defined by the SEC.  Upon information and belief, Mr. Gupta is a citizen of Connecticut.

22.     Defendant Ruth J. Simmons was a director of Goldman from January 2000 until her term ended in May 2010 and was a member of the Board of Directors' Compensation Committee and its Corporate Governance and Nominating Committee. Upon information and belief, Dr. Simmons is a citizen of Rhode Island.

23.     Defendant H. Lee Scott, Jr. was a director of Goldman from May 2010 until his term ended in May 2011 and was a member of all standing committees of its Board of

Directors.  The Board determined that he qualified as an audit committee financial expert as defined by the SEC.  Upon information and belief, Mr. Scott is a citizen of Arkansas.

24.    The defendants named in paragraphs 9 through 23 above may be collectively referred to as the "Individual Defendants."  The defendants named in paragraphs 9 through 18 above may be collectively referred to as the "Director Defendants."

## IV.    FACTUAL BACKGROUND

### A.    Goldman's Presence in the U.S. Mortgage and Servicing Businesses.

25.    In its mortgage business, Goldman has acted as a market maker, underwriter, placement agent, and proprietary trader in residential and commercial mortgage related securities, loan products, and other asset backed and derivative products.

26.    According to data obtained by the U.S. Senate Permanent Subcommittee On Investigations, during 2006 and 2007 Goldman underwrote 93 residential mortgage backed securities worth $72 billion.  The Subcommittee examined the Company's activities in 2006 and 2007 that it stated were aimed at generating profits from the collapse in the subprime mortgage market and found that the Company twice built large net short positions in mortgage related securities that generated billions of dollars in gross revenues. According to a September 17, 2007 presentation to the Company's Board,[2] the mortgage crisis and the Company's tactical positioning (including, but not limited to, having substantial short positions in certain subprime mortgage-related securities) were discussed by the Company's Board.[3]

---

[2] This presentation was made public in spring 2011 by the Subcommittee in connection with its report entitled *Wall Street and the Financial Crisis:  Anatomy of a Financial Collapse*.
[3] Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Gupta, Johnson, Juliber, and Simmons were directors of the Company at this time.

27.    One of the investments that the Company helped create and sold to investors was known as ABACUS 2007-AC1.  According to the Subcommittee, this investment was originated by the Company in response to a request by Paulson & Co. Inc., a hedge fund that was among Goldman's largest customers for subprime mortgage related assets.  "Paulson had a very negative view of the mortgage market, which was publicly known, and wanted Goldman's assistance in structuring a transaction that would allow it to take a short position on a portfolio of subprime mortgage assets that it believed were likely to perform poorly or fail."  The SEC filed a complaint against Goldman related to this investment and, on July 14, 2010, the Company reached a settlement with the SEC in which it agreed to pay a $550 million fine and admitted: "it was a mistake for the Goldman marketing materials to state that the reference portfolio was 'selected by' ACA Management LLC without disclosing the role of Paulson & Co. Inc. in the portfolio selection process and that Paulson's economic interests were adverse to CDO investors."

28.    In November 2007, Blankfein stated in an internal email to Cohn, Viniar, and other Goldman executives: "Of course we didn't dodge the mortgage mess.  We lost money, then made more than we lost because of shorts.  Also, it's not over, so who knows how it will turn out ultimately."

29.    In December 2007, the Company acquired Litton Loan Servicing LP.  It is a division of Goldman Sachs Bank USA, which is state-chartered in New York.  Standard & Poor's reports that Litton was the fourth-largest servicer of subprime loans based on unpaid principal balance and the ninth-largest subprime servicer based on number of loans serviced as of September 30, 2009.

30.    In connection with the Litton acquisition, Individual Defendant Viniar reportedly stated to analysts that the purchase was "not just to help us take advantage of

the distressed environment that we think we're in […] we think being able to purchase them is going to help us as the whole mortgage market kind of unfolds going forward."[4]

**B.      The Federal Bailout of the Company and its Servicing-Related Promises.**

31.    In early October 2008, TARP was signed into law.  Under TARP, the U.S. Department of the Treasury may purchase a variety of "troubled assets," including mortgage-related assets and the various types of securities based on such assets, if they were originated on or before March 14, 2008.  The Treasury Department also was authorized to expend billions of dollars to purchase bank equity shares through the Capital Repurchase Program.

32.    At the same time, Congress created the Congressional Oversight Panel (the "COP") to "review the current state of financial markets and the regulatory system."  The COP was empowered to hold hearings, review official data, and write reports on actions taken by Treasury and financial institutions and their effect on the economy.  Through regular reports, the COP must oversee Treasury's actions, assess the impact of spending to stabilize the economy, evaluate market transparency, ensure effective foreclosure mitigation efforts, and guarantee that Treasury's actions are in the best interests of the American people.

33.    Consistent with the TARP mandate, the Treasury Department also implemented HAMP, which is a national mortgage modification program that provides eligible borrowers the opportunity to modify their first lien mortgage loans to make them more affordable.  Any lending institution that has accepted TARP funds must participate in HAMP, and must apply a uniform loan modification process to provide eligible borrowers with affordable and sustainable monthly payments for their first lien mortgage loans.  Affordability is achieved through the application of interest rate reduction, term extension, principal forbearance and/or principal forgiveness.

---

[4] *Bloomberg*, "Goldman Sachs's Litton Mortgage Unit Resumes Some Foreclosures" (March 1, 2011).

34.   On October 13, 2008, defendant Blankfein, and representatives from eight other large financial institutions, attended a meeting in Washington D.C. with the senior officials of the Federal Reserve, U.S. Treasury, and FDIC to discuss a federal solution to the stress being experienced by the U.S. financial system.  As authorized by TARP, the institutions agreed to participate in a program involving bank liability guarantees and capital purchases by the federal government.  The "CEO Talking Points" for this meeting indicate that Blankfein and the other financial institution executives in attendance were instructed as follows:  "we want each of you to contact your Boards of Directors and confirm your participation this evening."

35.   As a result of this meeting, and having consulted the Company's Board of Directors, Blankfein executed a "Major Financial Institution Participation Commitment" dated October 13, 2008, which provided as follows:

> In support of the US financial system and the broader US economy, Goldman Sachs agrees to:
>
> Issue Preferred Shares in the amount of $10 billion to the US Treasury under the terms and conditions of the TARP Capital Purchase Program announced today.
>
> Participate in the FDIC program guaranteeing new issues of eligible senior liabilities by banks and bank holding companies and transaction accounts as announced today under the systemic risk exemption invoked by the FDIC, US Treasury, and the Federal Reserve.
>
> Expand the flow of credit to US consumers and businesses on competitive terms to promote the sustained growth and vitality of the US economy.
>
> Continue to work diligently, under existing programs, to modify the terms of residential mortgages as appropriate to strengthen the health of the US housing market.[5]

---

[5] During the fall of 2008, the Company also obtained approximately $5 billion from an outside investor (Berkshire Hathaway Inc.).  The SEC accused Individual Defendant Gupta of illegally tipping Galleon Group hedge fund founder Raj Rajaratnam of Berkshire's pending investment.

36.   On October 28, 2008, as part of its participation in TARP, Goldman raised $10 billion through the sale of cumulative perpetual preferred stock and a warrant that gave the Treasury Department the right to purchase shares of the Company's stock.  The preferred stock had an aggregated liquidation preference of $10 billion and an annual dividend rate (cumulative and payable quarterly in cash) of 5% for the first five years and 9% thereafter.

37.   On August 6, 2009, Goldman, via its Litton subsidiary, signed a Servicer Participation Agreement agreeing to perform loan modification and other foreclosure prevention services set forth in applicable HAMP guidelines and other procedures required by the Treasury Department, Fannie Mae or Freddie Mac.  In doing so, the Company became eligible to receive $1,000 or more for each completed permanent modification under HAMP.  It also agreed to implement the following internal controls:

> Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to:  (i) ensure effective delivery of Services in connection with the Program and compliance with the Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws.

> The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

> Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Program performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; a copy of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

38.   By agreeing to participate in HAMP through a Servicer Participation Agreement, Litton became eligible to receive up to $1.3 billion of TARP funds.[6]

---

[6] *See* Congressional Oversight Panel, "Evaluating Progress on TARP Foreclosure Mitigation Programs," 32 (April 14, 2010).

## V.   DEFENDANTS' WRONGFUL CONDUCT

### A.   Defendants Knew that Goldman Required Significant Additional Resources to Properly Discharge its Default Loan Management Responsibilities.

39.   On November 14, 2008, Individual Defendant Litton testified before House Subcommittee on Domestic Policy in a hearing entitled *Is Treasury Using Bailout Funds to Increase Foreclosure Prevention, As Congress Intended?*  Mr. Litton stated, in part:

> In the past year, we have observed several notable trends that are presenting increased challenges to servicers as well as homeowners.
>
> First of all, default rates have increased and have continued to do so at an accelerated rate.
>
> Second, redefault rates on loans that have been previously modified have gone up and are going up at an accelerating rate.
>
> Third, fewer customers are accepting the loan modifications that were being offered, including preapproved streamlined loan modifications.
>
> Fourth, foreclosures on vacant properties have doubled from this time last year.
>
> And, finally, our customers are facing tremendous economic head winds driven by higher incidences of job loss, wage compression and a host of other economic issues.
>
> It is clear to me that we as a servicing industry need to continue to be even more aggressive than we have been with modifying loan terms and finding new ways to get homeowners' payments down even further than we have done already.  We believe that this is good both for homeowners and communities, and it is also good for investors whose loans we are servicing.

40.   On January 27, 2009, Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Gupta, Johnson, Juliber, Mittal, Simmons, and Viniar caused the Company to file its 2008 Form 10-K with the SEC.  In doing so, these defendants certified and/or were responsible for discussing known trends, events or

uncertainties reasonably likely to have a material effect on the Company's results of operations or financial condition.   The Form 10-K set forth certain risk disclosures, including in part:

> ***Our businesses have been and may continue to be adversely affected by conditions in the global financial markets and economic conditions generally.***
>
> Our businesses, by their nature, do not produce predictable earnings, and all of our businesses are materially affected by conditions in the global financial markets and economic conditions generally.   In the past twelve months, these conditions have changed suddenly and negatively.
>
> Since mid-2007, and particularly during the second half of 2008, the financial services industry and the securities markets generally were materially and adversely affected by significant declines in the values of nearly all asset classes and by a serious lack of liquidity.   This was initially triggered by declines in the values of subprime mortgages, but spread to all mortgage and real estate asset classes, to leveraged bank loans and to nearly all asset classes, including equities [….]
>
> […] Banks and other lenders have suffered significant losses and have become reluctant to lend, even on a secured basis, due to the increased risk of default and the impact of declining asset values on the value of collateral.   The markets for securitized debt offerings backed by mortgages, loans, credit card receivables and other assets have for the most part been closed.
>
> * * *
>
> […] While lower interest rates, increased volatility, and substantial increases in trading volumes have positively impacted earnings in a number of our trading businesses, declines in asset values, the lack of liquidity, general uncertainty about economic and market activities and a lack of consumer, investor and CEO confidence have negatively impacted many of our other businesses, particularly our investment banking, merchant banking, asset management, credit products, mortgage, leveraged lending and equity principal strategies businesses [….]
>
> * * *
>
> ***Our businesses have been and may continue to be adversely affected by declining asset values.***

Many of our businesses, such as our merchant banking businesses, or mortgages, leveraged loan and credit products businesses in our FICC segment, and our equity principal strategies business, have net "long" positions in debt securities, loans, derivatives, mortgages, equities (including private equity) and most other asset classes [….] Because nearly all of these investing and trading positions are marked-to-market on a daily basis, declines in asset values directly and immediately impact our earnings, unless we have effectively "hedged" our exposure to such declines [….]

41.   On February 17, 2009, the parties to the certified nationwide class action lawsuit brought by homeowners, styled *Schaffer v. Litton Loan Servicing, LP,* Case No. CV 05-07673 (C.D. Cal.), jointly filed a notice of settlement of claims based on alleged violations of the Real Estate Settlement Procedures Act.  Those claims related to Litton's alleged improper imposition of late fees and/or treatment of homeowner payments as late during the 60-day grace period after the effective dates of loan transfers when borrowers timely sent mortgage payments to their old servicer.

42.   On May 11, 2009, the Massachusetts Attorney General announced that it had entered into an agreement with Goldman (on behalf of itself and certain affiliates) in order to conclude and resolve all issues arising from the Attorney General's investigation of certain subprime matters.  In connection with the settlement, Goldman agreed, among other things, to pay $10 million to Massachusetts and offer to provide certain relief to Massachusetts homeowners whose mortgages were owned by Goldman or its affiliates. The Settlement Agreement between the Attorney General of the Commonwealth of Massachusetts and Goldman was executed on May 7, 2009 by Gregory K. Palm, Goldman's Executive Vice President and General Counsel. Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Gupta, Johnson, Juliber, Simmons, Mittal, and Viniar disclosed this settlement in the Company's Form 10-Q filed with the SEC on August 5, 2009

43.   On March 1, 2010, Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Gupta, Johnson, Juliber, Mittal, Schiro, Simmons, and

Viniar caused the Company to file its 2009 Form 10-K with the SEC.  In doing so, these defendants certified and/or were responsible for discussing known trends, events or uncertainties reasonably likely to have a material effect on the Company's results of operations or financial condition. The Form 10-K set forth certain risk disclosures, including in part:

> ***Our businesses have been and may continue to be adversely affected by conditions in the global financial markets and economic conditions generally.***
>
> Our businesses, by their nature, do not produce predictable earnings, and all of our businesses are materially affected by conditions in the global financial markets and economic conditions generally.  In the past several years, these conditions have changed suddenly and, for a period of time, very negatively.
>
> In 2008 and through early 2009, the financial services industry and the securities markets generally were materially and adversely affected by significant declines in the values of nearly all asset classes and by a serious lack of liquidity.  This was initially triggered by declines in the values of subprime mortgages, but spread to all mortgage and real estate asset classes, to leveraged bank loans and to nearly all asset classes, including equities [….]  While the markets have generally stabilized and improved since the first quarter of 2009, asset values for many asset classes have not returned to previous levels.  Business, financial and economic conditions, particularly unemployment levels, lending activities and the housing markets, continue to be negatively impacted by the events of recent years.
>
> * * *
>
> Banks and other lenders have suffered significant losses and some have become reluctant to lend, even on a secured basis, due to the increased risk of default, the impact of declining asset values on the value of collateral and the impact of "risky" assets and transactions on capital requirements.  In addition, some financial institutions are unwilling to sell assets where the value of such assets are not "marked-to-market" and would have to be sold at a loss because they are worth significantly less than their current book value.  The markets for securitized debt offerings backed by mortgages, loans, credit card receivables and other assets, which for the most part were closed during 2008 and the beginning of 2009, have very recently begun to reopen.

* * *

**Our businesses have been and may be adversely affected by declining asset values.**

Many of our businesses, such as our merchant banking businesses, our mortgages, leveraged loan and credit products businesses in our FICC segment, and our equity principal strategies business, have net "long" positions in debt securities, loans, derivatives, mortgages, equities (including private equity) and most other asset classes[….] Because nearly all of these investing and trading positions are marked-to-market on a daily basis, declines in asset values directly and immediately impact our earnings, unless we have effectively "hedged" our exposures to such declines [….]

44.   On March 1, 2011, Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, Mittal, Schiro, Scott, and Viniar caused the Company to file its 2010 Form 10-K with the SEC.   In doing so, these defendants certified and/or were responsible for discussing known trends, events or uncertainties reasonably likely to have a material effect on the Company's results of operations or financial condition. The Form 10-K set forth certain risk disclosures, including in part:

**Our businesses have been and may continue to be adversely affected by conditions in the global financial markets and economic conditions generally.**

Our businesses, by their nature, do not produce predictable earnings, and all of our businesses are materially affected by conditions in the global financial markets and economic conditions generally.   In the past several years, these conditions have changed suddenly and, for a period of time, very negatively.   In 2008 and through early 2009, the financial services industry and the securities markets generally were materially and adversely affected by significant declines in the values of nearly all asset classes and by a serious lack of liquidity.

* * *

**Our businesses have been and may be adversely affected by declining asset values.   This is particularly true for those businesses in which we have net "long" positions, receive fees based on the value of assets managed, or receive or post collateral.**

Many of our businesses have net "long" positions in debt securities, loans, derivatives, mortgages, equities (including private equity and real estate) and most other asset classes [....]  Because nearly all of these investing, lending and market-making positions are marked-to-market on a daily basis, declines in asset values directly and immediately impact our earnings, unless we have effectively "hedged" our exposures to such declines [....]

\* \* \*

***We may be adversely affected by increased governmental and regulatory scrutiny or negative publicity.***

Governmental scrutiny from regulators, legislative bodies and law enforcement agencies with respect to matters relating to compensation, our business practices, our past actions and other matters has increased dramatically in the past several years.  The financial crisis and the current political and public sentiment regarding financial institutions has resulted in a significant amount of adverse press coverage, as well as adverse statements or charges by regulators or other government officials.  Press coverage and other public statements that assert some form of wrongdoing often result in some type of investigation by regulators, legislators and law enforcement officials or in lawsuits.  Responding to these investigations and lawsuits, regardless of the ultimate outcome of the proceeding, is time consuming and expensive and can divert the time and effort of our senior management from our business.  Penalties and fines sought by regulatory authorities have increased substantially over the last several years, and certain regulators have been more likely in recent years to commence enforcement actions or to advance or support legislation targeted at the financial services industry.  Adverse publicity, governmental scrutiny and legal and enforcement proceedings can also have a negative impact on our reputation and on the morale and performance of our employees, which could adversely affect our businesses and results of operations.

\* \* \*

**Certain Mortgage-Related Contingencies.**  There are multiple areas of focus by regulators, governmental agencies and others within the mortgage market that may impact originators, issuers, servicers and investors.  There remains significant uncertainty surrounding the nature and extent of any potential exposure for participants in this market.

**Representations and Warranties.  [....]**

\* \* \*

Based upon the large number of defaults in residential mortgages, including those sold or securitized by the firm, there is a potential for increasing claims for repurchases. However, the firm is not in a position to make a meaningful estimate of that exposure at this time.

**Foreclosure and Other Mortgage Loan Servicing Practices and Procedures.** The firm has received a number of requests for information from regulators and other agencies, including state attorneys general and banking regulators, as part of an industry-wide focus on the practices of lenders and servicers in connection with foreclosure proceedings and other aspects of mortgage loan servicing practices and procedures. The requests seek information about the foreclosure and servicing protocols and activities of Litton Loan Servicing LP (Litton), the firm's residential mortgage servicing subsidiary, and any deviations therefrom. The firm is cooperating with the requests and is reviewing Litton's practices in this area. These inquiries may result in the imposition of fines or other regulatory action. Litton temporarily suspended evictions and foreclosure and real estate owned sales in a number of states, including those with judicial foreclosure procedures. Litton has recently resumed some of these activities. As of the date of this filing, the firm is not aware of foreclosures where the underlying foreclosure decision was not warranted. As of December 2010, the value of the firm's mortgage servicing rights was not material and any impact on their value would not be material to the firm. Similarly, at this time the firm does not expect the suspension of evictions and foreclosure and real estate owned sales to lead to a material increase in its mortgage-servicing-related advances.

## B.     Consumer Complaints About the Company's Residential Mortgage Loan Servicing.

45.    The Company's mortgage loan modification processes and foreclosures have long been the subject of homeowners' complaints. Many of these complaints have echoed the same themes articulated by government regulators – e.g., lack of responsiveness to consumer inquiries about residential mortgage loan modifications; advice to troubled borrowers that they needed to default before the Company could assist them with modifications; submission of adverse credit reports to credit agencies with respect to troubled borrowers who were making payments on time or pursuant to modifications; pyramiding of fees; demonstrated unwillingness and/or inability to work

in good faith with consumers who are ready, willing, able, and qualified to receive such a loan modification; and its problematic foreclosure procedures.

46. In addition to the alleged wrongdoing set forth in the *Schaffer* class action, *Financial Times* reported on June 16, 2010 that the Houston chapter of the Better Business Bureau listed nearly 800 complaints in the U.S. against Litton in the past three years. Separately, on a scale of "A+" to "F", the chapter indicates on its website that it assigned Litton an "F" rating.

47. In addition, the following excerpts from hundreds of homeowner complaints posted on internet sites (e.g., consumeraffairs.com) illustrate the continued inadequacy of the Company's infrastructure to deal with troubled loans:

a. "12/17/10  We had never been late on any of our mortgage payments, and had been put in a loan that was interest only and also had a soft second mortgage with it. We owned our home for 4 years, our combined mortgages with Litton loan was around $1800. Or more. Plus we paid taxes and insurance. We were struggling for years to make sure we made the payments on time. We called Litton loan to ask about modifying our mortgage. They told us to fill out the paper work and get our pay stubs and tax info, and mail it in. We did and they at first said they were missing paper work so we kept resending it.

After several attempt, faxes, mailings. They said they received it, then I got a letter in the mail saying that they didn't have everything. Then I received another letter about a week later saying they had all info. I called Litton thru this whole process and they weren't helpful.

Finally after months went by I received a letter, I thought it was approved. But instead it was a denial letter. They said we were over income, come to find out they made a mistake on paper work and put our pay stubs as weekly paystubs instead of bi-weekly paystubbs. So it looked like we made double what we actually made.

I called to have them fix and they said they would fix it but about a week later we received paperwork to start over again. All because they made a mistake. I spent months battling. But I still sent new paper work and had them loose it again then to change there mind and say they actually revd it. A month or so went by then Litton was deducting to much from our bank accounts for the mortgage.

So we were double paying.  They said they would credit us back, but they never did.  We received over draft fees at one point after they completely depleted our accts.  I spoke to a supervisor who told me to fax info to him and he would take care of it but he never did.  They also never allied our escrow payments.

And our insurance payment bounced due to our acct being over drawn, Litton said they would fix they never did so insurance on home was cxled. I have begged to have the mortgage lowered, my home is worth almost $100,000 less than what we owe.  We just need help, and it's not fair, they take advantage of people.  They said they couldn't help me cuz I haven't defaulted in my mortgage.

Well now I have and they still haven't helped.

Tiffany of West yarmouth, MA"

b.  "12/21/10  I have tried working with the lender for over the past 22 months to modify the loan down from 9+%.  I completed the paperwork with no luck then hired a company that promised they could same my home and do the paperwork.  Hired an attorney, still no help.  I have tried working with them again submitting documents now over 5 times.  Last notice dated 12-9-2010 from Litton Loan stating they needed more paperwork and "no foreclosure sale will be conducted and you will not lose your home during this 30day period of review."

Yesterday I went to the home only to find they have changed the lock on the back door, posted signs on the sinks and toilets "property has been winterized" and took my items on the counters.  I called the police and filed a report # 103530629.  I have been calling Litton all day.  No answer. I received a call from the contracted told by Litton to lock the home.  MSI. Said Litton authorized them on December 8 to change the locks.

Then I receive a call from DMS stating that I called them about help with my loan?????  I explained that their number was on the winterized notice. Note the names listed First American Field Services *** *** ****and QHP Qwest Home Preservation-*** *** ****. At FAFS I was told they changed their name to Cor Logic back in June.  She checked the records and said the company should not have been using their documents.

I called QHP 4 times and they refused to give me any information but would have their manager call me back.  He never called but a lady from MSI in Texas called.  Now I have talked with 5 different companies associated with this so called "winterization notice" and there is only one correct name and number on it.

Please stop ALL of these agencies!. I can't believe that after all I and others have been thru, I am still going thru lenders trying to misuse me. This type of treatment is very disturbing that they break in my home, take my things then post notes for help sending me to another lender????

Something must be done on behalf of consumers!  I have contacted WA Attorney General's Office and the BBB.

P of Tacoma, WA"

c.  "1/4/11  There are so many complaints out there about Litton loan. Why is nothing being done about this company?  I just received a letter that I am over 1700…in the hole on my escrow how is this possible?  I make payments every month some months sending more, and I am 1.5 months behind in my mortgage.  I have never had any problems with my mortgage until Litton bought my mortgage about 4 years ago.

Now I am always late I am never going to get caught up I'm tired of fighting with this company something needs to be done with them.  The other day I received a letter for there permission to sell my house in a short sale.  I'm not selling my house, they need to get there records fixed, I can't deal with this company anymore.

I can't refinance because my credit is now all screwed up because of them, I'm at my wits end.

Edward of Jaffrey, NH"

d.  "1/11/11  In January of 2009, I had to close down my financial advisory practice because of the recession and lack of income.

I immediately contacted Litton to talk to them about solutions to making my mortgage payments during this difficult season for my family.  My wife was still working and we were cutting costs everywhere we could.

Litton said that until I stopped making mortgage payments, there was nothing they could do.  Eventually, Litton referred us to Titanium Solutions to help with our loan modification.

Titanium was less than helpful and told us to send the customary bank statements, tax statements, and a copy of our family budget.  After our request for modification was answered with a payment reduction of $71 per month, we had a feeling we were going to be in for a difficult process with Litton.

In March of 2009, we hired a local loan specialty group called Keep Your Home Nashville ($1000 fee for their help), to help with the modification. They guaranteed that they would get our loan modifified, or we would get half of our fee back.  We also have a HELOC, which Keep Your Home Nashville got modified in July 2009.  It was through Southeast Financial Credit Union.

Ironically, the credit union only needed us to submit the documents once and the process took 3 months.  The repayment schedule was modified from a 10 year repayment to a 30 year repayment and made permanent.

In July of 2009, Litton offered us a temporary modification.  We submitted 4 payments, which was required for the trial modification to become permanent.  We were notified by Litton on December 18, 2009 that the 4506-T form (which we submitted 3 other times prior to this) still had not been received and would be necessary in order for the modification to become permanent.

We were on vacation with family (working on my in-laws rental property in another state) at the time and were unable to re-submit the 4506-T form, which was the 4th time we had submitted it to Litton.

In January 2010, we were told that the modification wasn't made permanent because Litton didn't receive the necessary paperwork and because they didn't receive any of our temporary modification payments. We sent the payments registered mail and they were cashier's checks.  We have only received one of the payments back from Litton and the other checks were cashed.

We were then told by Keep Your Home Nashville that we would now be on our own to get the loan modified through Litton, but the process should be easy because Litton would fasttrack our loan modification because we had already been through the process and it would be easy to get a permanent modification.

Of course, this hasn't been the reality.  We were told to submit additional paperwork in July of 2010 and then denied a modification based on "not meeting the guidelines provided by the investor."

We are currently trying to work through the modification process again. Litton has given us the runaround time and time again.

Jason of Spring Hill, TN"

e.  "2/22/11  Since our loan was sold from Popular Mortgage to Litton we have had nothing but trouble.

They say we are a month behind from 4 years ago, so they have added 50.00 a month late charges every month for over 3 years, but they cannot tell us what month we are behind says it has to be when we were with Popular, they say for the last 4 years we have had no house Ins, so they have added almost $,00.00 to an escro that we don't have,

we have had continuous coverage with same ins co for over 10 years, they can't find proof or any paperwork, we were 1 seeki behind on taxes, just getting our income back to pay it and they added another year also making it over 5,000.00.

we have trying to get loan modified for over 6 months, have faxed paperwork 5 times and sent in mail 2x there is no evidence of any of our paperwork.  They added another 900.00 to loan to pay for all the fees that they have added to our mortgage.  We are Angry and need help.  if anyone knows any information on who we can call please post into.

Thank you.

These people are crooks and need to be stopped.

Sean of Wellington, OH"

f.  "2/27/11  In 2008, Litton Loans bought my loan from my first lender, Chase Bank.  MY payments were current in 2008.

From 2008-2009 my wife had surgical procedures done and as a result was out of work for approximately 9 months without pay.  In 2009, I spoke to a customer service representative about my financial circumstances due to loss of income from my wife's surgery and I was informed that I may be eligible for a loan modification.   Litton Loan Services sent me the paperwork and they gave me a "trial loan modification" for $2700 from my original payment of $2,090.

Litton claimed that they lowered my mortgage interest to 4%, however it did not reflect in my principal and interest.  So I declined the loan modification because it was too expensive.  Since then I've had multiple issues getting my questions answered, they have my owing exorbitant amounts of moies (their last calculation) $16,400.

I make my monthly payments every month via telephone (electronic payments).  Now in 2011, I cannot get a straight answer from a customer rep or supervisor (Ms. ******) of Loss Litigations.

My message went directly to voicemail.

Mr. of East Stroudsburg, PA"

g.  "3/2/11  Re: Litton Loan Servicing

In October 2005 we received a loan for $112,500 from New Century Mortgage Corporation.  In March of 2007 when the New Jersey banking regulators barred New Century from doing business in the state, our mortgage was picked up by Saxon Mortgage Services.

On September 28th, 2007 we were approved for a loan modification by Saxon Mortgage Services that stated, that as of 11/01/2007 our Unpaid Principal Balance is $111,058.37 and that we shoud begin making our monthly payment of principal and interest the 1st day of December 2007. In March of 2008, we received a Servicing Transfer Information Document from Litton Loan Servicing that stated:  Effective April 01, 2008, please begin remitting your payment to Litton.

After making our April and May payments that was deposited into a lock box account of Litton, we were informed by Litton that we had not made our first two (2) months mortgage payments.   Please not that we have not been late or missed a mortgage payment since before December 2007. During our inquirer we were informed by Litton that our mortgage payment were used to pay an allege negative escrow balance to Saxon for insurance and taxes.  In our letter to Litton June 30, 2008 we informed Litton that we never had an escrow attached to our mortgage loan payment.  In Litton letter to us dated July 11, 2008, they mention that the loan is not escrowed for the payment of the property taxes or homeowners insurance premium.

July 28, 2008, we had a law firm write Litton to outlining our many concerns regarding our mortgage loan with Litton.  Such as why did Litton use our mortgage payment to pay for flood insurance, when they had been giving a copy of the policy's declaration page proving we had the required coverage already?  We had mad four (4) mortgage payments and want to know where has the payments been apply, and how is it that our mortgage balance with them is $117,984.91 when our loan modification agreement states that it's $111,058.37 (Original Loan was only for $112,500).  We have been paying this loan for nearly three (3) years at this point.  We have requested the assistance of the New Jersey Real Estate Commission and New Jersey

Department of Banking and Insurance Division of Banking/Consumer Service Bureau on August 4, 2008 and received to little to no help. Nothing has changed and we are now facing with a more difffercult dilemma.

On, August 11, 2008 I had a stroke and was not able to address these issue again until August 2010 at which time I requested the assistance of the senator of my district.  On or about September 22, 2010 Saxon send us a check for $1,117.27, we requested a reason for this and to date have not received any.  However it's the same amount that Litton give Saxon from our first two (2) mortgage payment.

Recently I purchase the pre-paid legal service and had them write Saxon Mortgage Services and Litton Home Servicing, in a letter October 4, 2010 the law firm requested the following:

We dispute the balance owed and all late fees
We dispute the adverse reporting made to credit agencies, reports of delinquency in our mortgage payment has been reported as delinquent every month since April 01, 2008.
A full accounttin is needed as to all monies that have been paid and furthermore assurances that corrections are made to any and all credit agencies.

An explanation needs to be made with regards to why a $1,117.27 was returned by Saxon without any explanation

In a response letter dated October 22, 2010, Litton stated as followed:
If the mortgagors are unable to make the payments established in the modification, we recommend you contact our Default Counseling Department, to discuss other options.  We have not missed a mortgage payment in over 34 months.
We recommend that you contact Saxon Mortgage to discuss the returned payment of $1,117.27.  These are the funds taken from our mortgage payment that Litton gave to Saxon, they should have answer s to this matter too.  The information we have submitted to these agencies is accurate and therefore we are unable to change the credit reporting.  These reports are without merit.

A Detail Transaction History will be sent under separate cover.  We have not received this report as of yet.

On January 24, 2011, we notice that our January mortgage payment made 01/07/2011 had been returned, when I called to inquire and was giving just an 800 number to call.  When called, an agen for Green Tree Mortgage was reached who had less information in regards to our mortgage then I.  However, she did say that theywere now the servicer of our mortgage and that Litton should had forward that payment to them.  I requested a Servicing Transfer Information Report, to which she said that one had been send to another address and not to the address of the mortgagor.  We have not paid our mortgage payment for January, February or March.  We

have and have requested written prove and lender information before we can make payment to any one.  As of March all our mortgage payment will by place in a escrow account.

My wife and I are in dire need of legal or other assistance now!

Respectfully requested,

Saundra, **********

Moses, **********

Moses of Jersey City, NJ"

h.  "3/7/11  My husband and I just found out that a house we bought in 2001 and sold around 2004 we payed off a 53,000 dollar home loan to them and they say and reported to and on our credit that it is a outstanding loan which has ruined our credit!!! We sold the home and paid them the 53,000 dollars

brandy of robinson, IL"

i.  "3/11/11  We had our Loan motified as of Jan 2011 and we have made every payment that they required of us.  In Jan 3,2011 they said a certified check was returned.  It was not.  Us not knowing anything about this continued to make a monthly payments, so our payment that we made Jan 29,2011 for Feb 2011 was applied to Jan 2011.  Now they continue you say that we are behind a payment.  Every payment has been made, is made by certified checks and I have all the receipts.  They are now reporting us as being late every month to the credit agencies and they have now added over 3000.00 in service fees to our account.

Edward of Spotswood, NJ"

j.  "3/22/11  I have just received foreclosure papers today from a law firm representing litton loan services.  What I don't understand is why.  In the last three weeks I have sent them 4000.00, but they only have accepted 2000.00, they have not cash one of the checks I sent them.  This problem with litton loan started when popular sold my mortgage to them we have owned this house for ten years and been with litton for three of them and all of a sudden I am two months behind in my mortgage.  This is so untrue when you call to speak to a representative they tell me they received my payment, but it is not for what I sent, so you argue and pass me to someone else, who says yes we received that amount that you sent.

They just don't know what they are doing over there. They claim my escrow is negative balance of over 1000.00 how is this possible if I send my monthly payment plus escrow? I just don't know what to do anymore. I think it is time for the government to step in with this company, because so many people are losing there home falsely because of litton loan. I have talked to someone who said he would help for the tune of 1200.00 it would be ok if I really could afford to pay this amount, and If I really knew this would help resolve my problems.

Stephanie of Jaffrey, NH"

k. "3/31/11  I began the Loan Modification process with Litton Loan in October of 2010. I have made my mortgage payments on time; however, as these economic times become increasingly harsher I am finding it more and more difficult to make my mortgage payments. With recent hospital bills the month payments become even harder to maintain. I have provided Litton Loan Servicing with many copies of the required documentation (multiple copies of the exact forms within a month of each other). Litton continues to say my application is incomplete. I then provide new or additional information to them as requested. Another month goes by and they request the exact same paperwork I provided them the month prior. It is now the end of March, beginning of April (6 months) and still I am providing them with documentation I have already sent them many times. I am convinced they are dragging their feet so I'll give up, get frustrated, and quit the process. It takes less than a month for a new mortgage or even to buy a new house.

They have a total lack of customer service. Each time I call to check on the modification they act as they are my customer and I should bend over backwards for them, rather than vice versa. They have no concept of helping the customer. It's not like I want out of my mortgage, I am willing to pay it in full, I just need a reduced rate or month payment for a time being.

d of Cheney, WA"

l. "4/9/11  Litton loan servicing has failed several times to timely post my payments to my account, causing late fees problems. Litton loan servicing has always refused to transfer my phone call to a supervisor or manager.I have never been late with any of my payments, and always mailed about 10 days before due date.

On May 2009 billing statement appeared an illegitimate charge of $ 197.50 that Litton Loan decided to add to my account. Almost 2 years later and that issued has not been resolved, supervisor or manager never returned any of my phone calls.

On October 2010 billing statement appeared an illegitimate charge of $2,829.29 amount that was added by litton loan servicing with out my knowledge making my monthly payment double.  I have called more than 30 times and asked to speak to a supervisor or manager and the customer care department they always denied my request.  6 months later and those charges still appearing on my monthly statement.  I have not been able to resolved this problem because nobody from litton loan customer care can explained why that amount was added to my account, I have left numerous message for the supervisor or manager but they have never returned any of my phone calls.  Every time I spoke to the customer care department they always asked me to sent that late payment immediately or late fees and interest will be added.

On February 13,2011 I mailed a written inquiry which was certified with a return receipt.  I was very clear what I wrote, if they don't corrected those illegitimate charge I will needed to talk to my attorney and go to court,but I also sent the last 13 copies of my return checks from my bank.  It shows that I have never been late with my payments.

But,on March 2011 I did not received my billing statement so I called Litton loan immediately and I was told that I have changed my home address and will not received any more statements and for now on they can only talked to an attorney or I needed to hire one.  I told litton loan customer care that I have been living in the same house for the past 15 years and I did not moved or changed my home address and I did not have an attorney.  Litton loan wans me to requested my monthly statement in written because they can not longer sent one.Litton Loan is refusing to sent out my monthly statement.

Talking to the customer care which they are very rude and unwilling people is just a waste a time.  I have spent countless hours trying to resolved this issues.  As todays April 04, 2011 I have not received a response from my inquiry neither my monthly statement..

Another problem, I have an escrow account for my property insurance and taxes, but every year litton loan failed to made my house insurance on time.  Every year the insurance company almost cancel my policy because of late payment.  They do not sent the payment on time and I have called litton loan many times and complaint about this problems but they done nothing.  I'AM SENDING MY HOUSE MORTGAGE MONTHLY PAYMENT WITHOUT THE STATEMENT, BUT MY BANK IS DOING A DIRECTLY PAYMENT TO LITTONLOAN SERVICING

Fernando of Hawthorne, CA"

m.   "5/4/11  I have a question.  After many calls & 3 months of headaches and tears to litton to get my modification processed.   My loan was modified by $13,000 and my interest rate lowered to 4.3%.   Later we received a 1099 for $13,000 as income earned?  Was this legal?  This put us in higher income bracket and we owed $10,000.  We were only able to pay our taxes through a payment plan.  I'm confused how did this help?

Pat of Whittier, CA"

**C.      Investigations Into Servicing and Foreclosures and Moody's/S&P's Servicer Quality Ratings of Litton Loan.**

48.      The COP issued its first report in March 2009 entitled "Foreclosure Crisis: Working Toward a Solution," which explained problems within the residential mortgage loan servicing industry, in part, as follows:

a.      [W]hen homeowners try to contact their servicers to request a modification, they are often unable to reach them.   Homeowners often have to wait on the phone for hours to get through to a servicer representative at a call center.  For working families in particular, the time involved in trying to contact the servicer can be prohibitive.  Homeowners who are trying to deal with their mortgage during their lunch breaks or between two jobs often give up because they cannot get through to their servicers.

b.      [S]everal servicers have openly acknowledged that they simply were not prepared for the volume of loss mitigation requests that this crisis has generated.

c.      Servicers either lack the staffing to effectively respond to loss mitigation requests or have artificially ramped up capacity at a level that precludes training and oversight of staff.

d.      It is difficult for homeowners to initiate productive discussions with lenders because many servicers lack the capacity to deal with a large volume of modifications.

49.      The COP issued another report in November 2010 entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation," which observes that banks and loan servicers are vulnerable to litigation by homeowners and State attorney generals who claim that homeowners have suffered

improper foreclosures.  The report also states that "[e]ven the prospect of such losses could damage a bank's stock price or its ability to raise capital."

50.     On November 23, 2010, the Financial Stability Oversight Council held an open session meeting chaired by Secretary of the Treasury Timothy Geitner.  At that meeting, Assistant Treasury Secretary Michael Barr stated, in part, as follows:

> The foreclosure working group has five key objectives:  determining the scope of problems; holding the Companies accountable for fixing these problems; making sure individuals who have been harmed are given redress, and that firms pay penalties where appropriate for their actions; getting the mortgage servicing industry to do a better job for households in financial difficulty by providing alternatives to foreclosure; and acting in a coordinated and comprehensive way to hold the firms accountable, bring clarity and certainty, and help households.

> There are five key areas under review at this time:  First, foreclosure process; second loss mitigation; third, origination putbacks; fourth, securitization trusts; and, lastly, disclosures.

> Reviews are ongoing, and we expect to report back to the council at its January meeting with initial findings.  In the interim, let me make a couple of key points.  First, we are working to bring clarity and certainty as quickly as we can, but reviews will take time; and second, the bulk of the examination work to date focused on the foreclosure process has found widespread and, in our judgment, inexcusable breakdowns in basic controls in the foreclosure process.  These problems must be fixed.

> Let me provide a brief overview of the extent to the reviews.  Earlier this fall, we formed a foreclosure task force at your request in which 11 federal agencies, including the relevant FSOC [Financial Stability Oversight Council] entities, plus the FTC, the Department of Justice and the Department of Housing and Urban Development have been and are coordinating investigations of the largest mortgage servicers, key service providers such as LPS and MERS, certain law firms and other matters.  The working group is also coordinating closely with the states, both the attorney generals and state bank regulators.

> Regulators are conducting on-site foreclosure exams of the largest mortgage servicers.  The exams are designed to test and verify the adequacy and integrity of bank assessments and corrective actions, governance over foreclosures to ensure foreclosures are completed in accordance with applicable legal requirements, and that affidavits and claims are accurate, and to determine whether troubled borrowers were

properly considered for loss mitigation activities, such as loan modifications prior to foreclosure.

The scope of work to assess foreclosure governance is extensive, and includes an assessment of each servicer's foreclosure policies and procedures, organizational structure and staffing, vendor management, quality control, loan documentation, including custodial management and foreclosure processes.

Examiners are also conducting interviews with personnel and reviewing samples of individual borrower foreclosure files from all 50 states that include both in-process and completed foreclosures.

Examiners are expected to complete on-site fieldwork by the end of the year. Once this fieldwork is completed, regulators will aggregate results across institutions to ensure consistency, prepare supervisory letters, and determine supervisory actions that may be needed.

The regulators will draft a horizontal foreclosure report that identifies the range of industry foreclosure practices and common foreclosure governance, and control weaknesses that need remediation. The regulators are targeting to complete this work by late January.

In addition to reviewing the foreclosure process, there are also ongoing reviews for compliance with loss mitigation procedures, including intensive reviews with respect to modifications by both FHA and the Treasury Department.

Separate and apart from these foreclosure and modification violations, servicers may face risks from failure to follow investor guidelines for originating loans during the height of the boom. Origination putbacks at relatively large scale have been occurring for some time, and will likely continue for several years. There have also been concerns raised regarding whether documentation problems exist with respect to loans in securitization trusts. Regulators have begun to review compliance by servicers, custodians and trustees with procedures required by pooling and servicing agreements, trust in custodial agreements and related contracts.

In late October, with respect to disclosure, the SEC issued a letter to major institutions to remind them of their disclosure obligations, in light of concerns about potential risks and costs associated with mortgage and foreclosure-related activities or exposures.

In sum, Chairman, major financial institutions are being reviewed for problems across a wide range of issues in foreclosure processing, loss

mitigation, origination putbacks, securitization trusts and disclosure requirements.  These reviews are ongoing, and the foreclosure task force will report back to this council at its January meeting.

51.     On December 1, 2010, Daniel K. Tarullo, a member of the Board of Governors of the Federal Reserve, testified before the Senate Committee on Banking, Housing, and Urban Affairs.  He said that preliminary findings from the Federal Reserve's banking examiners "suggest significant weaknesses in risk-management, quality control, audit, and compliance practices as underlying factors contributing to the problems associated with mortgage servicing and foreclosure documentation.  We have also found shortcomings in staff training, coordination among loan modification and foreclosure staff, and management and oversight of third-party service providers, including legal services."  As a result, he concluded that these "widespread" issues "suggest structural problems in the mortgage servicing industry" and that it "has not been up to the challenge of handling the large volumes of distressed mortgages."[7]

52.     On December 1, 2010, John Walsh, Acting Comptroller of the Currency, testified before the Senate Committee on Banking, Housing, and Urban Affairs, stating that the reported foreclosure improprieties represent "a serious operational breakdown in foreclosure governance and controls that national banks should maintain."  He also noted that on September 29, 2010, the OCC ordered the largest national bank servicers to conduct a comprehensive self-assessment of their foreclosure management processes, including file review and affidavit processing and signature.

53.     On December 2, 2010, Julie L. Williams, Chief Counsel and First Senior Deputy Comptroller of the Currency, testified before the House Committee on the Judiciary.  She also noted that six unidentified "large bank servicers have publicly

---

[7]  He also noted a number of possible reasons for the explosion of foreclosures, including "the lack of servicer capacity to execute modifications, purported financial incentives for servicers to foreclose rather than modify, what until recently appeared to be easier execution of foreclosures relative to modifications, limits on the authority of securitization trustees, and conflicts between primary and secondary lien holders."

acknowledged deficiencies in their foreclosure processes.  The lapses that have been reported represent a serious operational breakdown in foreclosure governance and controls that national banks should maintain."  She cited a number of breakdowns in the foreclosure processes of the large mortgage loan servicers, including about whether the appropriate affidavits were signed if required under state law; whether notaries violated standard procedures (e.g., notarizing documents after they had been signed); and the overall accuracy of information and existence of proper documentation to support a foreclosure proceeding.

54.   On May 25, 2011, *The New York Times* reported that the Federal Reserve Bank of New York has begun an investigation into Litton, looking at whether it systematically rejected borrowers' efforts to lower their loan payments through government programs.  The inquiry arose from a letter sent by an anonymous Litton employee who reportedly accused Litton of consistently denying modifications to loans that qualified for government modifications.

**D.    Admissions and the Use of "Robo-signers" in Foreclosures.**

55.   During October 2010, Individual Defendant Viniar reportedly stated that Litton had 23,000 mortgages in the foreclosure process and was undertaking an extensive review of its procedures.

56.   That month, Litton "suspended foreclosure proceedings in certain cases while it completes a review of its procedures."

57.   A number of state court systems that had proactively examined lender foreclosure practices concluded that action needed to be taken to protect the integrity of the judicial process.  In New York, for example, in an October 20, 2010 *sua sponte* administrative order entered by the Chief Administrative Judge of the state courts of New York, the plaintiffs in all pending residential mortgage foreclosure actions were required

to submit an affirmation from their attorneys affirming that he or she has inspected all documents and that such documentation was correct and accurate.

58.     This, and similar, court actions resulted from the foreclosing plaintiffs' widespread use of people known as "robo-signers."  The Superior Court of New Jersey explains the term in an administrative order entered in the matter styled *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities*, Superior Court of New Jersey, Chancery Division-General Equity Part, Mercer County, Docket No. F-059553-10:  "'[r]obo-signers are mortgage lender/servicer employees who sign hundreds – in some cases thousands – of affidavits submitted in support of foreclosure claims without any personal knowledge of the information contained in the affidavits [and] '[r]obo-signing may also refer to improper notorizing practices or document backdating."

59.     The Company's mortgage servicing arm, like others, has utilized robo-signers in foreclosures.  By way of example only, in the action styled *U.S. Bank National Association as Successor to Lasalle Bank National Association, as Trustee for the C-Bass Mortgage Loan Asset-Backed Certificates, Series 2007-CB5 v. Austin, et al.*, No. 08-47335 13 (Broward County, Florida Circuit Court), an executive secretary and foreclosure supervisor for Litton Loan with over thirty years in the mortgage business (Denise Michelle Bailey) testified that she spent her entire workdays signing affidavits related to foreclosures, did not know what purpose affidavits served in foreclosure actions, had no personal knowledge of the items within the affidavits, and had no knowledge of what basic terms such as "promissory note," "mortgagee," "grantee," "lien," "assignor," "owner of record," and "default" meant.  She also testified that the notary working with her never even placed her under oath.

E.     **The Servicer Settlement Demand and Rejection.**

60.    On or about March 3, 2010, the largest mortgage loan servicers received a comprehensive settlement term sheet from various federal and state authorities, including

state attorneys general, the Justice Department, Federal Trade Commission, Bureau of Consumer Financial Protection, Federal Trade Commission and the Department of Housing and Urban Development, related to the servicing of owner-occupied properties serving as the primary residence of borrowers (the "Servicer Settlement Demand").

61.   The Servicer Settlement Demand outlines a comprehensive set of remedial steps, including those related to the following:

a.   standards for affidavits and sworn statements in foreclosure and bankruptcy proceedings;

b.   requirements for accuracy and verification of borrower's account information;

c.   documentation of note, holder status, and chain of assignment;

d.   quality assurance systems/audits;

e.   specific loss mitigation requirements, including:   the affirmative duty to thoroughly evaluate borrowers for all available loss mitigation options before foreclosure referral; prohibition of dual tracking trial modifications and foreclosures; providing a single point of conduct to borrowers; accuracy of loss mitigation communications with borrowers; independent review of loss mitigation denials;

f.   general loss mitigation requirements, including:

(1) maintenance of adequate staffing and systems for tracking borrower documents and information that are relevant to foreclosure, loss mitigation, bankruptcy, and other servicer operations;

(2) maintenance of adequate staffing and caseload limits for employees responsible for handling foreclosure, loss mitigation, bankruptcy, and related communications with borrowers and housing counselors;

(3) establishment of reasonable minimum experience, educational and training requirements for loan modification staff;

(4) electronic documentation of each action taken on a foreclosure, loan modification, bankruptcy, or other servicing file, including all communications with the borrower and other parties;

(5) adoption of incentives and compensation plans that encourage appropriate loss mitigation over foreclosure;

(6) prohibition against making inaccurate payment delinquency reports to credit reporting agencies when borrowers are making timely reduced payments pursuant to a trial or other loan modification agreement;

(7) prohibition against instructing, advising, or recommending that borrowers go into default in order to qualify for loss mitigation relief; and

(8) prohibition against discouraging borrowers from working or communicating with legitimate non-profit housing counseling services.

g.    consideration and application of, where appropriate, principal reduction loan modifications;

h.    provision of loan modifications, including principal reductions, related to second liens;

i.    general requirements for servicing fees, including:

(1) that such fees be bona fide and reasonable, and disclosed to borrowers;

(2) prohibition of default, foreclosure-related, or bankruptcy-related fees while a completed loan modification application is under consideration or being performed as a trial modification; and

(3) prohibition of mark-ups on any third-party fees.

j.    specific servicer fee provisions, including:

(1) maintenance of a current schedule of standard or common fees (e.g., nonsufficient fund fees) that is available to borrowers upon request;

(2) collection of fees from borrowers only for reasonable and necessary services actually rendered and fee is expressly authorized and clearly disclosed to borrower, or fee is expressly permitted by law and not prohibited by the loan instrument , or fee is not prohibited by law or loan instruments and is reasonable for a specific service requested by the borrower;

(3) attorneys' fees charged are for work actually done;

(4) with respect to late fees, prohibitions of pyramiding, restrictions on attempts to collect late fees, and prohibitions of late fees when the borrower makes timely trial modification payments;

k.    restrictions on third party fees;

l.    restrictions on force-placed insurance

m.    prohibition against engaging in unfair or deceptive business practices or misrepresenting or omitting any material information in connection with the servicing of the loan (including, but not limited to, misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a loan, the terms and conditions of the servicing agreement, loss mitigation options, or the borrower's obligations under the loan); and

n.    adoption of enhanced corporate governance procedures to monitor compliance with the settlement that could include establishment of a compliance committee of the board of directors.

62.    On or about March 28, 2011, several large banks responded to the Servicer Settlement Demand with a counterproposal entitled "Draft Uniform Servicing

Standards."  This counterproposal, however, rejected many key parts of the settlement demand, and remained silent about—and thus implicitly rejected—many other remedies set forth in the Servicer Settlement Demand, including principal reduction loan modifications, second liens and conflicts of interest, in-sourced vendor fees or force-placed insurance to affiliates, and pyramiding of fees.

**F.     The Making Home Affordable Program Performance Report.**

63.     In mid-June 2011, the U.S. Treasury published the *Making Home Affordable Program Performance Report Through April 2011.*

64.     This report contains a residential mortgage servicer assessment with respect to Litton and states:  "Litton Loan Servicing LP has areas requiring moderate improvement[;]" and "Withholding [servicer incentives] may commence next quarter if Litton Loan Servicing LP fails to demonstrate improvement in the next assessment."

65.     This report also states that internal controls for program management, reporting, and governance require moderate improvement, as they did the prior quarter.

**VI.     DAMAGES TO GOLDMAN**

66.     As a result of the Individual Defendants' wrongful conduct, the Company has expended, and will continue to expend, significant sums of money.

67.     The Company faces substantial penalties, fines and related costs from its misguided efforts to save money by under-investing in an adequate infrastructure to properly service its troubled loans.   In a February 14, 2011 document entitled "Perspectives on Settlement Alternatives in Mortgage Servicing" prepared by the Consumer Financial Protection Bureau, the Bureau stated "[r]ough estimates suggest that the largest servicers may have saved more than $20 billion through under-investment in proper servicing during the crisis.  As a result, a notional penalty of roughly $5 billion would seem too low."  And as reported by *Reuters* on April 14, 2011, acting Comptroller of the Currency John Walsh stated that "[a]n independent review of the U.S. banks'

foreclosures over the past few years will help regulators determine the fines banks will have to pay for mortgage servicing abuses."

68.     Goldman's Form 10-Q for first quarter 2011 states, in part:

**Foreclosure and Other Mortgage Loan Servicing Practices and Procedures.**  The firm has received a number of requests for information from regulators and other agencies, including state attorneys general and banking regulators, as part of an industry-wide focus on the practices of lenders and servicers in connection with foreclosure proceedings and other aspects of mortgage loan servicing practices and procedures.  The requests seek information about the foreclosure and servicing protocols and activities of Litton, the firm's residential mortgage servicing subsidiary, and any deviations therefrom.  The firm is cooperating with the requests and is reviewing Litton's practices in this area.  These inquiries may result in the imposition of fines or other regulatory action.

69.     Goldman thus faces a broad range of current and future expenditures proximately caused by the misconduct of the Individual Defendants as alleged herein, including the costs incurred and to be incurred from the following:

    a.     responding to investigations conducted by the Financial Crisis Inquiry Commission;

    b.     responding to investigations conducted by the Financial Stability Oversight Counsel;

    c.     responding to the interagency investigation concerning mortgage foreclosure documentation problems conducted by the Office of the Comptroller of the Currency, the Federal Reserve, the Federal Deposit Insurance Corp., and the Office of Thrift Supervision;

    d.     responding to investigations conducted by state attorneys general into the Company's foreclosure and other mortgage loan servicing practices and procedures;

    e.     defending against class litigation commenced against the Company by homeowners;

70.     The Company also has suffered losses, and faces huge future potential liability from its failures to follow applicable state laws and regulations governing the documentation of ownership in the residential real property that provides security for residential mortgage loans.

## VII.   THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

71.     By reason of their positions as directors and fiduciaries of Goldman Sachs, and by virtue of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Goldman Sachs and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Goldman Sachs and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

72.     Each of the Individual Defendants owed and owes to Goldman Sachs and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

73.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

74.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of Goldman Sachs.  By virtue of such duties, they were required to, among other things:

> a.     exercise good faith to ensure that Goldman Sachs' affairs were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality provision of financial services to its customers;

> b.     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and

state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

d.     remain informed how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

75.     The Individual Defendants who were and are members of the Board committees responsible for risk oversight assumed additional fiduciary duties in connection with such service.

76.     ***The Audit Committee.***  During the Relevant Period, the Company had a standing committee of the Board known as its Audit Committee.

a.     The Audit Committee's charter notes that among other things, this committee is to "assist the Board in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications, independence and performance, (iv) the performance of the Company's internal audit function and (v) the Company's internal control over financial reporting[.]"

b.     The members of this committee were charged under its charter to, among other things, (i) review and discuss with management the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Controls and Procedures, (ii) discuss, as applicable, issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies and the effect of regulatory initiatives on

the Company, (iii) review procedures for the receipt, retention and treatment of complaints received by the Company regarding internal controls, (iv) discuss with management periodically the guidelines and polices governing the process by which risk assessment and management is undertaken while coordinating with the Risk Committee as appropriate, and (v) discuss with one of the Company's General Counsel and/or Chief Compliance Officer any significant legal, compliance or regulatory matters that may have a material impact on the Company's business or compliance policies.  In fulfilling these duties, the members of this committee were charged with considering, among other things, the potential effect of any matter on the Company's reputation.

77.     ***The Risk Committee.***  During the Relevant Period, the Company had a standing committee of the Board known as its Risk Committee.  According to its charter, the Risk Committee assists "the Board in its oversight of the Company's management of financial and operational risks, including market, credit and liquidity risks."  The Risk Committee chairperson was charged with liaising with the Audit Committee chairperson to assist that committee in its review of the Company's financial and operational risks.  In fulfilling committee duties and responsibilities, members were charged with considering, among other things, the potential effect of any matter on the Company's reputation.

78.     Each of the Individual Defendants, by virtue of his or her positions as a director or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith, and diligence in the management and administration of its affairs, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations to Goldman, the absence of good faith on their part, and a knowing or

willful disregard for their duties to the Company and its shareholders that the Individual Defendants were aware posed a risk of serious injury to the Company.

79.     As the Director Defendants stated in the Company's most recent shareholder proxy statement, one of the distinguishing features of the Company's corporate governance is that all non-officer directors serve on all of its Board's standing committees (including the Audit Committee and the Risk Committee) and, as a result, they have been more engaged in the broad oversight of the Company.  They stated that this structure allows for a collective focus by non-officer directors on various matters before the committees and that the overlap assists non-officer directors in the execution of their responsibilities.

80.     The Individual Defendants breached their fiduciary duty of loyalty to act in the best interests of the Company by failing to take necessary steps to strengthen its default loan management-related processes, procedures, and controls, despite having knowledge that such became essential in the wake of the fallout in the mortgage business, and even though they represented to the federal government that such function and related controls were in place.  The Company, lacking a sufficiently staffed and controlled default loan management infrastructure, frequently outsourced the function to third parties which, in many cases, improperly performed that function.

## VIII.  DERIVATIVE ACTION ALLEGATIONS

81.     Plaintiff brings this action derivatively on behalf of and for the benefit of Goldman Sachs to redress injuries suffered, and yet to be suffered, by it as a direct and proximate result of the breaches of fiduciary duty alleged herein.  The Company is named as a nominal defendant solely in a derivative capacity.

82.    Plaintiff purchased shares of Goldman Sachs common stock during 2007 and has held such shares continuously since he purchased them.  Thus, Plaintiff was a Goldman Sachs shareholder at the time of the wrongdoing complained of herein. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in this litigation, and intends to retain his shares of Goldman Sachs throughout the duration of this litigation.

83.    The wrongful acts complained of herein subject, and will persist in subjecting, Goldman Sachs to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

84.    The wrongful actions complained of herein were unlawfully concealed from the Company's shareholders.

## IX.    DEMAND EXCUSED ALLEGATIONS

85.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.    Goldman Sachs' current Board is comprised of eleven directors:  Director Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, Mittal, and Schiro; and, Debora L. Spar, who became a director in June 2011.

87.    Plaintiff did not make a pre-suit demand on the Board to bring the derivative claims herein because such a demand would have been a futile and useless act, and therefore, such a demand is legally excused.

88.    Defendants Blankfein and Cohn are executive officers of the Company and therefore not independent.

89.     Of the current Board members, eight (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, and Juliber) were Company directors when the Board discussed in fall 2007 the mortgage crisis and tactical steps taken by the Company (including, but not limited to the Company's short positions).  These defendants cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to ensure that the Company's default loan management resources, procedures, and controls were sufficient for it to properly perform that function.

90.     Of the current Board members, eight (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber) authorized Blankfein to enter into the "Major Financial Institution Participation Commitment" in late October 2008 promising regulators that Goldman would "[c]ontinue to work diligently, under existing programs, to modify the terms of residential mortgages as appropriate to strengthen the health of the U.S. housing market."  These defendants cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to perform their promise as discussed herein.

91.     Of the current Board members, eight (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, and Mittal) highlighted a variety of risks facing the Company within its 2008 Form 10-K as set forth above.  With respect to the 2009 and 2010 Forms 10-K, nine of the current Board members (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, Mittal, and Schiro) highlighted similar and additional risks to the Company as set forth above.  These defendants cannot impartially consider a demand because they face a substantial likelihood of liability,

having failed to ensure that the Company's default loan management resources, procedures, and controls were sufficient for it to properly perform that function.

92.     Of the current Board members, ten (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, Mittal, Schiro) were Company directors when it caused its mortgage servicing subsidiary to execute the Servicer Participation Agreement in August 2009.  These defendants cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to ensure that the Company's default loan management resources, procedures, and controls were sufficient for it to properly perform that function.

93.     Of the current Board members, nine (Blankfein, Brian, Cohn, Dahlback, Friedman, George, Johnson, Juliber, and Mittal) were Company directors when the Company agreed to settle the *Schaffer* and the Massachusetts Attorney General matters. These defendants cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to ensure that the Company's default loan management resources, procedures, and controls were sufficient for it to properly perform that function.

94.     On information and belief, all current Board members received the servicer settlement demand referenced herein and rejected material provisions of it.

95.     Accordingly, all current Board members have demonstrated their unwillingness and inability to address the claims alleged herein seeking pecuniary and other relief to compensate the Company for the wrongdoing alleged herein.  Thus, Plaintiff did not make a demand on the current Board before instituting this action because the factual allegations herein create a reasonable doubt that a majority of the

Director Defendants could have properly exercised independent and disinterested business judgment in responding to such a demand.

96.     Plaintiff did not make a demand on the shareholders of Goldman to institute this action because such a demand would have been a futile and useless act for at least the following reasons:

a.     Goldman is a publicly-held company with millions of shares that are issued and outstanding;

b.     making a demand on such a number of shareholders would be impracticable and impossible for Plaintiff, who has no way of determining the names, addresses or phone numbers of such shareholders;

c.     making a demand on all shareholders would force Plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

## DERIVATIVELY ON BEHALF OF GOLDMAN

### (Against the Individual Defendants For Breach of Fiduciary Duty)

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     At all relevant times the Individual Defendants owed the utmost fiduciary duty of loyalty to the Company and its shareholders.

99.     The Individual Defendants' duty of loyalty required that they act in good faith to protect the best interests of the Company and its shareholders.

100.    At all relevant times, the Individual Defendants knew that the Company's exposure to nonprime residential loans, the decline in the housing market, and Company

agreements with the Federal government required that they ensure the Company had sufficient resources, processes and controls in place to perform proper residential default loan management.

101. At all relevant times, the Individual Defendants failed to timely take necessary remedial steps to address the Company's deficient default loan management internal controls and resources, failed to compensate the Company for their own misconduct, and failed to pursue remedies against other persons who may be responsible for the wrongdoing alleged herein.

102. Accordingly, the Individual Defendants breached their duties of loyalty by acting unfaithfully to the Company and its shareholders in numerous ways as described above.

103. The Individual Defendants are not entitled to any protections that may otherwise have been afforded by the business judgment rule.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of Goldman, Plaintiff prays for judgment as follows:

A.   A determination that this action is a proper derivative action maintainable under law and that demand is excused;

B.   Against each Individual Defendant and in favor of Goldman for the amount of damages sustained by the Company as a result of the violations of law alleged herein;

C.   Directing Goldman to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described

herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders a vote on the following corporate governance policies:

1.      a proposal to remove from the Board those members who have breached their fiduciary duties to the Company;

2.      a proposal to strengthen the Company's controls relative to the manner in which it intakes, processes and decides upon loan modification requests from homeowners;

3.      a proposal to strengthen the Company's controls relative to processes used to decide whether to foreclose on a residential mortgage loan in a default status;

4.      a proposal to strengthen the Company's controls relative to the processes used to foreclose on defaulted residential mortgage loans;

5.      a proposal to strengthen the Board's oversight and supervisory roles relative to the Company's residential mortgage loan modifications;

6.      a provision to permit the Company shareholders to nominate candidates for election to the Board; and

7.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board relevant to the matters complained of herein.

D.      For extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder.

E.      Awarding to Goldman restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants from the Company.

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts and accountants.

G.      Granting Plaintiff such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all applicable issues.

Dated:  July 1, 2011                    Respectfully submitted,


SMITH FOOTE, LLP
Brian D. Brooks
bbrooks@smithfoote.com
260 Madison Avenue, 8th Floor
New York, NY 10016
Tel:    (646) 216-2124
Fax:    (318) 487-1741


EMERSON POYNTER LLP
John G. Emerson
jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX 77058-2610
Tel:   (281) 488-8854
Fax:  (281) 488-8867

Scott E. Poynter
scott@emersonpoynter.com
500 President Clinton Ave., St. 305
Little Rock, AR 72201
Tel: (501) 907-2555
Fax: (501) 907-2556

JIGARJIAN LAW OFFICE
Robert A. Jigarjian
jigarjianlaw@gmail.com
128 Tunstead Avenue
San Anselmo, CA 94960
Tel: (415) 341-6660

*Attorneys for Plaintiff*

## VERIFICATION

I, Michael G. Brautigam, am the Plaintiff in this shareholder derivative action and I was a Goldman Sachs shareholder during the relevant times that the events alleged to have taken place in this Complaint occurred.   Also, I continue to hold my shares.   I believe the factual allegations in the Complaint to be true based upon my own personal knowledge and my counsel's investigation.   Having received a copy of this Complaint, having reviewed it with my Counsel, I hereby authorize its filing.

Michael G. Brautigam