**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE GOLDMAN SACHS MORTGAGE SERVICING SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 1:11-cv-4544-WHP<br><br>(Consolidated with Case No. 1:11-cv-6504-WHP) |
| This Document Relates To:<br><br>ALL ACTIONS | VERIFIED, CONSOLIDATED AND AMENDED SHAREHOLDER DERIVATIVE COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Michael G. Brautigam and Retirement & Relief System Of The City Of Birmingham, Alabama ("Plaintiffs"), by and through their attorneys, derivatively on behalf of nominal defendant The Goldman Sachs Group, Inc. ("Goldman" or the "Company"), submit this Verified Consolidated and Amended Shareholder Derivative Complaint against the Defendants named herein.  Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief developed from the investigation and analysis of their counsel, which includes, among other things, public filings by Goldman with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, matters of public record available from various state and federal government websites, complaints pending against the Company in state and federal courts, and other information available in the public domain.  To the best of Plaintiffs' knowledge, information, and belief, the allegations herein not based on personal knowledge are likely to have evidentiary support after a reasonable opportunity for further investigation, discovery, and analysis.

The crux of the Plaintiffs' complaint against the officers and directors of Goldman is that they were intentionally derelict and/or consciously disregarded their fiduciary duty of loyalty to the company by making several decisions for which there was no valid business justification, including, but not limited to: (a) causing the company to accept $10 billion in taxpayer money in exchange for contracting to participate in an unprecedented federal government program designed to provide relief to the nation's crippled housing market by modifying eligible mortgages of taxpayers on the brink of foreclosure, yet inexcusably breaching their commitments and obligations under the contract; (b) allowing  the Company to engage in the illegal and unconscionable practice of "robo signing" or the robotic, mass production of false and forged mortgage assignments, satisfactions, affidavits and other foreclosure related documents by

persons without knowledge of the facts attested to and without checking the accuracy of the foreclosure documents, often resulting in improper and illegal foreclosure of taxpayers' homes; and (c) causing the company to violate applicable laws by knowingly and intentionally packaging troubled loans in real estate mortgage backed securities ("RMBS") that it sold to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation as well as other unsuspecting investors without properly disclosing the true nature of the underlying loans and through material misrepresentations in various offering documents.  As a result of defendants' breaches of loyalty owed to Goldman, the company is now the subject of numerous investigations, lawsuits, consent orders and restrictions on business by Congress, State Attorneys General, the Department of Justice, and numerous other federal and state regulatory authorities.   All of which has caused and will continue to cause significant financial damage to the Company, and perhaps most importantly, irrevocable injury to Goldman's reputation.

## I. <u>NATURE OF THE ACTION</u>

1.      This is a shareholders' derivative action brought by Plaintiff for the benefit of Goldman against Defendants, who are certain current and former members of the Company's Board of Directors (the "Board") and certain of its officers.  This action seeks to recover for Goldman and its shareholders the billions of dollars of financial and reputational damages caused by the Defendants' failure to comply with its obligations under the Emergency Economic Stabilization Act (also known as the Troubled Asset Relief Program "TARP") and the Making Home Affordable Program ("HAMP").  Goldman failed to adequately staff its loan servicing division, failed to maintain adequate internal controls as required by HAMP and otherwise failed in the duties that it agreed to in exchange for receiving billions of dollars in federal funds. As a result the Company is now subject to serious legal liability.  Further, the Company's material

misstatements and omissions in its registration statements and other marketing materials for securitizations that it structured, marketed and sold to investors including Fannie Mae, Freddie Mac and other defrauded investors also now subject Goldman to serious legal liability.

2.      This legal liability, which includes Goldman being the subject of numerous state, federal and private investigations, lawsuits, settlements and consent orders, with additional actions against the Company and certain key officers likely to come, is the direct and proximate cause of the Board members' breaches of their fiduciary duty of loyalty owed to Goldman.

## II. JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one intended to confer jurisdiction on a court of the United States that the Court would otherwise lack.

4.      Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including all or primarily all of Defendants' participation in the wrongful acts detailed herein, occurred in this District.  One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

### III. PARTIES

**Plaintiffs**

5.     Plaintiff, Michael G. Brautigam, as set forth in the accompanying verification, is, and was at all relevant times, a shareholder of nominal defendant Goldman Sachs, Inc.  He is a citizen of the state of Ohio.

6.     Plaintiff, the Retirement and Relief System the City of Birmingham, as set forth in the accompanying verification, is, and was at all relevant times, a shareholder of nominal defendant Goldman Sachs, Inc.  The Birmingham Retirement System is a municipal pension system, managed by a seven member Board of Trustees.  Four members are elected by their fellow city employees; one member is appointed by the Mayor of the City; one member is appointed by the Jefferson County Personnel Board and one member serves on the Board of Trustee by virtue of his position as Mayor of the City.  The Birmingham Retirement System is a citizen of the State of Alabama.

**Nominal Defendant**

7.     Nominal Defendant Goldman is a Delaware corporation with its principal executive offices located at 200 West Street, New York, New York.  Goldman is a full services global financial institution organized as a bank holding company and a financial holding company regulated by the Federal Reserve Board, which provides securities related services to a diverse client base including corporations, governments, other financial institutions, and individuals.  Among its many diverse financial services, in 2007 Goldman purchased Litton Loan Servicing, Inc. ("Litton") where it conducted it residential mortgage service business until it recently sold this division to Ocwen Financial Corporation ("Ocwen").  The Company is

5

segmented into four divisions: Investment Banking, Institutional Client Services, Investing & Lending and Investment Management.

**Defendants**

8.     The biographical information for each of the Defendants below has been taken from the Company's proxy statements and website:

9.     Defendant Lloyd C. Blankfein has been Chairman and Chief Executive Officer ("CEO") of Goldman since June 2006 and a director since April 2003. Previously, he was President and Chief Operating Officer ("COO") since January 2004. Prior to that, from April 2002 until January 2004, he was a Vice Chairman of Goldman Sachs, with management responsibility for Goldman Sachs' Fixed Income, Currency and Commodities Division (FICC) and Equities Division (Equities). Prior to becoming a Vice Chairman, he had served as co-head of FICC since its formation in 1997. From 1994 to 1997, he headed or co-headed the Currency and Commodities Division. Defendant Blankfein is not on the board of any public company other than Goldman Sachs and has not been a director of any other public company in the past five years. He is affiliated with certain non-profit organizations, including as a member of the Dean's Advisory Board at Harvard Law School, the Dean's Council at Harvard University, the Advisory Board at Tsinghua University School of Economics and Management, an overseer of the Weill Medical College of Cornell University, and a board member at the Partnership for New York City.  On information and belief Mr. Blankfein is a citizen of New York.

10.     Defendant Gary D. Cohn has been President and COO of Goldman since April 2009 and a director since June 2006.  Defendant Cohn previously was President and Co-COO of Goldman from June 2006 through March 2009. Previously, he had been the co-head of Goldman Sachs' global securities businesses since January 2004. He also had been the co-head of Equities

since 2003 and the co-head of FICC since September 2002. From March 2002 to September 2002, he served as co-chief operating officer of FICC. Prior to that, beginning in 1999, Defendant Cohn managed the FICC macro businesses. From 1996 to 1999, he was the global head of Goldman Sachs' commodities business. Defendant Cohn is not on the board of any public company other than Goldman Sachs and has not been a director of any other public company in the past five years. He is affiliated with certain non-profit organizations, including New York University Hospital ("NYU"), where he serves as a trustee for the hospital and medical school and chairman of the Advisory Board for NYU Hospital for Joint Disease, a trustee Harlem's Children Zone and American University.  On information and belief Mr. Cohn is a citizen of New York.

11.     Defendant John H. Bryan has been a director of Goldman since November 1999, and he serves as the Presiding Director and Chair of Goldman's Corporate Governance and Nominating Committees.  Mr. Bryan is the retired Chairman and CEO of Sara Lee Corporation ("Sara Lee"), where he spent more than 25 years overseeing this global consumer products company. He served as Sara Lee's CEO from 1975 to June 2000 and as its Chairman of the Board from 1976 until his retirement in October 2001.  He has previously served as a director for BP p.l.c. and General Motors Corporation. He is also the past Chairman of the Grocery Manufacturers of America, Inc. and the past Vice Chairman and a current member of The Business Council. He also served as Co-Chairman of the World Economic Forum's annual meetings in 1994, 1997 and 2000. In addition, Mr. Bryan is affiliated with certain non-profit organizations, including as a Life Trustee of The University of Chicago, as the past Chairman and Life Trustee of the Board of Trustees of The Art Institute of Chicago, as Chairman of the Board of Directors of Millennium Park, Inc., and as the past Chairman and a current member of

The Chicago Council on Global Affairs. He is also the past Chairman of Catalyst. On information and belief Mr. Bryan is a citizen of Illinois.

12.    Defendant Claes Dahlbäck has been a director of Goldman since June 2003. He serves as a Senior Advisor to Investor AB, a Swedish-based investment company, and is also a Senior Advisor at Foundation Asset Management, which is owned by three Wallenberg Foundations and which acts as advisor to the Foundations with respect to their holdings. He previously served as Investor AB's nonexecutive Chairman from April 2002 until April 2005, its Vice Chairman from April 1999 until April 2002 and its President and CEO from 1978 until April 1999. Previously Mr. Dahlbäck served as a director for Gambro AB and Stora Enso OYJ. Defendant Dahlbäck is affiliated with certain non-profit organizations, including as a member of the Royal Swedish Academy of Engineering Sciences and of Naval Sciences, as Honorary Doctor and Director of the Stockholm School of Economics, as Chair of the Leader of the Year Award, as Chair of the Stockholm School of Economics Association and as Commander of the Order of the White Rose of Finland. On information and belief Mr. Dahlbäck is a citizen of Sweden.

13.    Defendant Stephen Friedman has been a director of Goldman since April 2005 and serves as Chairman of the Risk Committee. Previously, Mr. Friedman was the Chairman of Stone Point Capital, a private equity firm. Prior to this he was a Senior Advisor to Stone Point Capital. He was Chairman of the President's Intelligence Advisory Board and Chairman of the Intelligence Oversight Board from January 2006 to January 2009. He served as Assistant to the President for Economic Policy and Director of the National Economic Council from December 2002 until December 2004. Defendant Friedman is also a past Chairman of the Federal Reserve Bank of New York. From 1998 until December 2002, Defendant Friedman was a senior principal

of MMC Capital, the predecessor of Stone Point Capital. He retired as Senior Partner and Chairman of the Management Committee of The Goldman Sachs Group, L.P., the Company's predecessor, in 1994, having joined The Goldman Sachs Group, L.P. in 1966.  In addition, he is affiliated with certain non-profit organizations, including as a board member of the Council on Foreign Relations, Memorial Sloan Kettering and The Aspen Institute.  On information and belief Mr. Friedman is a citizen of New York.

14.     Defendant William W. George has been a director of Goldman since December 2002.  Previously, Mr. George was CEO of Medtronic, Inc. from May 1991 to May 2001 and its Board Chairman from April 1996 until his retirement in April 2002. He joined Medtronic in 1989 as President and COO. Prior to joining Medtronic, he spent ten years as a senior executive with Honeywell International Inc. and ten years with Litton Industries, primarily as President of Litton Microwave Cooking. Defendant George is a Professor of Management Practice at the Harvard Business School, where he teaches leadership and leadership development. He was formerly Professor of Leadership and Governance at the International Institute for Management Development from January 2002 until May 2003, Visiting Professor of Technology Management at the École Polytechnique Fédérale de Lausanne from January 2002 until May 2003 and an Executive-in-Residence at the Yale School of Management from September 2003 through December 2003. He has published extensively on leadership and corporate governance issues. Defendant George is also on the board of Exxon Mobil Corporation and previously served as a director for Novartis AG and Target Corporation. In addition, he is affiliated with certain non-profit organizations, including as a board member of the World Economic Forum USA and the Guthrie Theater and as a member of the Carnegie Endowment for International Peace.  On information and belief Mr. George is a citizen of Massachusetts.

15.    Defendant James A. Johnson has been a director of Goldman since May 1999 and serves as Chair of Goldman's Compensation Committee.  Since April 2001, Mr. Johnson has served as a Vice Chairman of Perseus, L.L.C., a merchant banking and private equity firm.  From January 2000 to March 2001, he served as Chairman and CEO of Johnson Capital Partners, a private investment company. From January through December 1999, he was Chairman of the Executive Committee of Fannie Mae, having previously served as its Chairman and CEO from February 1991 through December 1998 and its Vice Chairman from 1990 through February 1991.  In addition to Goldman, Mr. Johnson serves as a director for Forestar Group Inc. and Target Corporation.  He previously served as a director for Gannett Co., Inc., KB Home, Temple-Inland and UnitedHealth Group Inc. Mr. Johnson is also affiliated with certain non-profit organizations, including as Chairman Emeritus of the John F. Kennedy Center for the Performing Arts and The Brooking Institute, as a member of each of the American Academy of Arts and Sciences, the American Friends of Bilderberg and the Council on Foreign Relations. On information and belief Mr. Johnson is a citizen of Idaho.

16.    Defendant Lois D. Juliber has been a director of Goldman since March 2004.  She has held numerous positions with Colgate-Palmolive Company, including Vice Chairman from July 2004 until March 2005,  COO from March 2000 to September 2004,  Executive Vice President — North America and Europe from 1997 until March 2000 and as President of Colgate North America from 1994 to 1997.  In addition to Goldman, Ms. Juliber serves as a director for E. I. du Pont de Nemours and Company and Kraft Foods Inc.  She is affiliated with certain non-profit organizations, including serving as Chairman of The MasterCard Foundation, a Trustee Emerita of Wellesley College and a Director for the Women's World Banking.  On information and belief Ms. Juliber is a citizen of New York.

17.     Defendant Lakshmi N. Mittal has been a director of Goldman since June 2008. Since May 2008, Mr. Mittal has been Chairman and CEO of ArcelorMittal S.A.  He previously served as ArcelorMittal's President and CEO from November 2006 to May 2008. Prior to that, Mr. Mittal was CEO of Mittal Steel Company N.V. (formerly the LNM Group) since 1976, when he founded the company. In addition to Goldman and ArcelorMittal, Mr. Mittal is on the boards European Aeronautic Defence and Space Company EADS N.V.   He previously served on the board of ICICI Bank Limited.   Defendant Mittal is affiliated with several non-profit organizations, including a member of the International Business Council of the World Economic Forum, the Advisory Board of the Kellogg School of Management at Northwestern University, the Board of Trustees of Cleveland Clinic, the Executive Committee of World Steel Association and the Executive Board of the Indian School of Business.  On information and belief Mr. Mittal is a citizen of Luxembourg.

18.     Defendant James J. Schiro has been a director of Goldman since May 2009.  He is the former CEO of Zurich Financial Services, a position he held from 2002 until December 2009. He previously served as Zurich's COO — Finance from March 2002 to May 2002. Prior to that, Defendant Schiro was CEO of PricewaterhouseCoopers LLP from 1998 to 2002 and Chairman and CEO of Price Waterhouse from 1995 to 1998, having previously held a variety of other positions at Price Waterhouse since 1967. In addition to Goldman, Mr. Schiro is on the boards of PepsiCo, Inc. and Royal Philips Electronics. Additionally, Defendant Schiro is a director of certain non-profit organizations, including St. John's University, a member of the Advisory Board of the Tsinghua University School of Economics and Management, a trustee of the Institute for Advanced Study and Vice Chairman of the American Friends of the Lucerne Festival.  On information and belief Mr. Schiro is a citizen of New Jersey.

19.     Defendant Debora L. Spar has been a director since June 2011.  Since 2008, Ms. Spar has served as President of Barnard College.  Prior to her presidency at Barnard College, Ms. Spar held numerous position at Harvard Business School from 1991 until 2008, including: Spangler Family Professor of Business Administration from 2005-2008; Senior Associate Dean and Director, Division of Research and Faculty Development from 2005-2007; Senior Associate Dean, Recruiting from 2004-2005; Professor of Business, Government and Competition; Chair, Business; Government, and the International Economy Unit from 1999-2004; Associate Professor of Business, Government and Competition from 1995-1999; Assistant Professor of Business, Government and Competition from 1991-1995.  Defendant Director Spar is affiliated with several non-profit organizations including as a member of the Committee on Foreign Relations, Chair, Making Markets Work, Board of Trustees, The Nightingale-Bamford School and member, American Academy of Arts & Sciences.  On information and belief, Defendant Spar is a citizen of New York.

20.     Defendant Larry B. Litton Jr. served as President of Litton for Goldman.  Litton was founded by Larry Litton Sr. in 1988, and the firm specialized in servicing subprime mortgages.   Goldman purchased Litton in 2007 and has recently sold the company to Ocwen. Upon information and belief Defendant Litton is a citizen of Texas.

21.     Defendant David Viniar has served as Executive Vice President and Chief Financial Officer ("CFO") since May 1999.  Since December 2002, he has headed Goldman's Technology, Finance and Service Division.  Upon information and belief Defendant Viniar is a citizen of New York.

22.     Defendant Dr. Ruth J. Simmons was a board member of Goldman from January 2000   through the end of her term in 2010.   Dr. Simmons has been President of Brown

University since July 2001. She was President of Smith College from 1995 to June 2001 and Vice Provost of Princeton University from 1992 to 1995. Dr. Simmons has also served on the board of one public company in addition to Goldman Sachs: Texas Instruments Inc. In addition, Dr. Simmons is affiliated with certain non-profit organizations, including as a trustee of Howard University and as a member of the American Academy of Arts and Sciences, the American Philosophical Society and the Council on Foreign Relations.

23. Defendant Rajat Gupta was a board member of Goldman from November 2006 through the end of his term in 2010. Mr. Gupta was recently indicted by federal authorities for violating insider trading laws. Mr. Gupta, has been Senior Partner Emeritus of McKinsey & Company since 2003. He previously served as McKinsey & Company's Worldwide Managing Director from 1994 until 2003. Prior to that, Mr. Gupta held a variety of positions at McKinsey & Company since 1973. Mr. Gupta has served on the boards of the following public companies in addition to Goldman Sachs: AMR Corporation, Genpact LTD and Procter & Gamble. He is also an independent director of Qatar Financial Authority. He is affiliated with certain non-profit organizations, including as Chairman of the Board of The Global Fund to Fight AIDS, Tuberculosis and Malaria, Chairman of the Board of the Indian School of Business and the Associates of the Harvard Business School, a member of the Advisory Board of the Kellogg School of Management at Northwestern University, the Dean's Advisory Board at Tsinghua University School of Economics and Management and the Dean's Council of the Harvard School of Public Health and Co-Chair of the American India Foundation. Mr. Gupta also served as the United Nations Secretary-General's Special Advisor on UN management reform.

24. The Defendants named above in paragraphs 9 through 23 may collectively be

referred to as "Individual Defendants," and the defendants named above in paragraphs 9 through 19 may be referred to as "Director Defendants."

## IV. DUTIES OF INDVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors and/or fiduciaries of Goldman and because of their ability to control the business and corporate affairs of Goldman, the Defendants owe and owed Goldman and its shareholders fiduciary duty of loyalty and were and are required to use their utmost ability to control and manage Goldman in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Goldman and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26.     To discharge their duties, the officers and directors of Goldman were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and business affairs of Goldman. By virtue of such duties, the officers and directors of Goldman were required, among other things, to:

   a.    manage, conduct, supervise and direct the business affairs of Goldman in accordance with federal and state law and federal rules and regulations and the charter and bylaws of Goldman;

   b.    manage, conduct, supervise and direct the business affairs of Goldman in accordance with TARP and HAMP;

   c.    take the necessary steps to ensure ongoing compliance with TARP and HAMP by providing sufficient resources to Litton to allow for proper loan modifications, particularly in light of the Company's knowledge of the subprime market;

   d.    establish proper internal controls to ensure continued compliance with TARP and HAMP;

   e.    neither violate nor knowingly permit any officer, director, or employee of Goldman to violate applicable federal laws, rules and regulations and/or state laws with regard to selling any security;

f.      establish and maintain systematic and accurate reports and records of the business and affairs of Goldman and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of said reports and records;

g.      exercise reasonable control and supervision over the public statements including registration statements and marketing sales materials provided to the public and Goldman's clients;

h.      remain informed as to the status of Goldman operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal laws; and

i.      supervise the preparation and filing of any audits, reports or other information required by law from Goldman and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Goldman and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

## V. <u>CORPORATE DUTIES</u>

27.     Director Defendants Bryan, Dahlback, Friedman, George, Johnson, Juliber, Mittal, Schiro and Spar are all independent board members as defined by the rules of the NYSE. Each of these Defendants serve on the four standing committees of the Board, with Defendant Bryan serving as Chair of the Corporate Governance and Nominating Committee; Defendant Johnson, serving as Chair of the Compensation Committee; Defendant Friedman, serving as Chair of the Risk Committee and Defendant Schiro, serving as Chair of the Audit Committee. Standing Committee membership is limited to Board members who are independent under the rules of the New York Stock Exchange.

<u>Audit Committee</u>

28.     According to the Audit Committee's charter the purpose of the Audit Committee includes but is not limited to the following:

[. . .] assist the Board in its oversight of (i) the integrity of the Company's financial statements, (ii) the ***Company's compliance with legal and regulatory requirements,*** (iii) the independent auditor's qualifications, independence and performance, (iv) the performance of the Company's internal audit function, (v) the Company's internal control over financial reporting, and (vi) the ***Company's management of market, credit, liquidity and other financial and operational risks....*** (Emphasis added)

29.     Among the many duties and responsibilities of the Audit Committee, it is charged with the following:

To discuss with management periodically management's assessment of the Company's market, credit, liquidity and other financial and operational risks, and the guidelines, policies and process for managing such risks.

To discuss with one of the Company's General Counsel and/or Chief Compliance Officer any significant legal, compliance or regulatory matters that may have a material impact on the Company's business, financial statements or compliance policies.

<u>Nominating and Corporate Governance Committee</u>

30.     According to the Corporate Governance and Nominating Committee's charter the purpose of the Corporate Governance and Nominating Committee is to:

[. . .] recommend individuals to the Board for nomination, election or appointment as members of the Board and its committees, consistent with the criteria included in the Company's Corporate Governance Guidelines, to oversee the evaluation of the performance of the Board and the Company's Chief Executive Officer ("CEO"), to review and concur in the CEO's and other senior management's succession plans, ***and to take a leadership role in shaping the corporate governance of the Company, including developing, recommending to the Board and reviewing on an ongoing basis the corporate governance principles and practices that should apply to the Company.*** (Emphasis added)

31.     Among the many duties and responsibilities of the Corporate Governance and Nominating Committee, it is charged with the following:

To develop and recommend to the Board a set of corporate governance principles and practices applicable to the Company and, at least once a year, to review those principles

and practices and recommend to the Board any revisions the Committee deems necessary and desirable.  To review, at least once a year, the Company's Code of Business Conduct and Ethics and recommend to the Board any revisions the Committee deems necessary and desirable.

Risk Committee

32.     In September 2010, the Board decided to create a Risk Committee, separate from the Audit Committee to focus specifically on risk-related issues and the firm's risk management structure.  According to the Company's 2011 Proxy Statement, the duties of the Risk Committee include:

> [. . .] reviews and discusses with management our firm's capital plan, regulatory capital ratios and internal capital adequacy assessment process and the effectiveness of our financial and operational risk management policies and controls.  In addition, Mr. Friedman, as the Chair of the Committee, frequently met or had discussions with our CEO and our General Counsel, as well as our CRO and other key risk management executives.

Corporate Governance Guidelines

33.     The Goldman Board has adopted "Corporate Governance Guidelines" which are available on the Company's website.  These corporate governance principles have been adopted purportedly "to promote the effective functioning of the Board and its committees, to promote the interests of the shareholders, and to ensure a common set of expectations as to how the Board, its various committees, individual directors and management should perform their functions."

34.     The guidelines enumerate numerous responsibilities of the Board including providing direction and oversight to the Company and managing or directing the business affairs of the Company in compliance with the law.   Also, included among these enumerated responsibilities of the Board is the following:

> *Reviewing and Approving Significant Transactions.*   Board approval of a particular transaction may be appropriate because of several factors, including:

- legal or regulatory requirements
- the materiality of the transaction of the Company's financial performance, risk profile or business,
- the terms of the transaction, or
- other factors, such as the entering into of a new line of business or a variation from the Company's strategic plan.

To the extent the Board determines it to be appropriate, the Board shall develop standards to be utilized by management in determining types of transactions that should be submitted to the Board for review and approval or notification.

Goldman Sachs Code of Business Conduct

35.     The Goldman Board has also adopted a "Code of Business Conduct and Ethics,"

which is available on the Company's website.   This Code of Business Conduct and Ethics

purportedly,

[. . .] embodies the firm's commitment to conduct our business in accordance with the highest ethical standards and in compliance with all applicable laws, rules and regulations.  The Code applies to all of our people, including members of our Board of Directors.

\* \* \*

**Fair and Ethical Competition**
We rely on our people to uphold our culture of integrity in all that we do.  Our values demand that we deal fairly with out clients, service providers, suppliers, competitors and each other.   No one at the firm may seek competitive advantage through illegal or unethical business practices.  Taking unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practices is a violation of this Code.

\* \* \*

**Public Disclosure**
It is our policy that all information in our public communications – including SEC filings – be full, fair, accurate, timely and understandable.  All individuals who are involved in our disclosure process must act in a manner consistent with this policy.  In particular, they are required to maintain familiarity with the relevant disclosure requirements, and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the firm to others, whether within or outside the firm, including our independent auditors.

36.     Also available on the Company's website is further evidence of its purported commitment to the highest legal and ethical standards and its recognition that protecting its reputation was paramount, is the following statement:

> **Our assets are our people, capital and reputation**
> If any of these is ever diminished, the last is the most difficult to restore.  We are dedicated to complying fully with the letter and spirit of the laws, rules and principles that govern us.  Our continued success depends upon unswerving adherence to this standard.

## VI.  <u>SUBSTANTIVE ALLEGATIONS</u>

**Factual Background**

### A.  The Company's Presence in the Loan Servicing Business.

37.     In its mortgage business, Goldman has acted as a market maker, underwriter, placement agent, and proprietary trader in residential and commercial mortgage related securities, loan products, and other asset backed and derivative products.

38.     In 2007, Goldman entered the loan servicing business when it purchased Litton from Credit-Based Asset Servicing and Securitization ("C-Bass") for approximately $430 million.  Litton was based in Houston and had more than 1,000 employees servicing some 400,000 customers.  Litton specialized in servicing high-risk mortgages, similar to the type that Goldman packaged and securitized.   Litton was founded in 1988 by Larry Litton, Sr., who developed an expertise in collecting mortgage payments from borrowers near default.  Litton was sold in 1996 to C-Bass, a company which bought troubled loans from banks and used Litton to collect.  Because a large portion of Litton's portfolio was troubled loans, Goldman had first-hand knowledge of the foreclosure crisis.  David Viniar, Goldman CFO told analysts that Goldman's purchase of Litton was, "not just to help us take advantage of the distressed environment that we

think we're in […] we think being able to purchase them is going to help us as the whole mortgage market kind of unfolds going forward."[1]

39.     Through the purchase of Litton, Goldman would become the twenty-third largest loan servicer in the U.S. and a major player in the subprime loan servicing arena.  Between January 1, 2009 and December 31, 2010, Litton initiated 135,586 foreclosures, with an even larger number of mortgages denoted as past due.[2]

40.     During the relevant period Litton Loan's management reported to an operational reporting committee of Goldman Sachs Bank USA.  Its business plan entailed assuming the role of servicer for assets purchased by the Company, who may also retain an interest in any RMBS purchases.

**B.     The Federal Bailout of the Company and its Servicing-Related Promises.**

41.     In early October 2008, TARP was signed into law.  Under TARP, the U.S. Department of the Treasury may purchase a variety of "troubled assets," including mortgage-related assets and the various types of securities based on such assets, if they were originated on or before March 14, 2008.  The Treasury Department also was authorized to expend billions of dollars to purchase bank equity shares through the Capital Repurchase Program.

42.     Consistent with the TARP mandate, the Treasury Department also implemented HAMP, which is a national mortgage modification program that provides eligible borrowers the opportunity to modify their first lien mortgage loans to make them more affordable.  Any lending institution that has accepted TARP funds must participate in HAMP, and must apply a uniform loan modification process to provide eligible borrowers with affordable and sustainable monthly payments for their first lien mortgage loans.  Affordability is achieved through the application of interest rate reduction, term extension, principal forbearance and/or principal forgiveness.

---

[1] Christine Harper, *Bloomberg,* "Goldman Sach's Litton Mortgage Unit Resumes Some Foreclosures" March 1, 2011.

[2] In the Matter of Goldman Sachs Group, Inc. and Goldman Sachs Bank USA, Consent Order, Board of Governors of the Federal Reserve System, Docket No. 11-112-B-HC and 11-112-B-SM (Sept. 1, 2011).

43.     On October 13, 2008, Blankfein, and representatives from eight other large financial institutions, attended a meeting in Washington D.C. with the senior officials of the Federal Reserve, U.S. Treasury, and FDIC to discuss a federal solution to the stress being experienced by the U.S. financial system.  As authorized by TARP, the institutions agreed to participate in a program involving bank liability guarantees and capital purchases by the federal government.  The "CEO Talking Points" for this meeting indicate that Blankfein and the other financial institution executives in attendance were informed:  "we want each of you to contact your Boards of Directors and confirm your participation this evening."

44.     As a result of this meeting, and having consulted the Company's Board of Directors, Blankfein executed a "Major Financial Institution Participation Commitment" dated October 13, 2008, which provided as follows:

> In support of the US financial system and the broader US economy, Goldman Sachs agrees to:
>
> Issue Preferred Shares in the amount of $10 billion to the US Treasury under the terms and conditions of the TARP Capital Purchase Program announced today.
>
> Participate in the FDIC program guaranteeing new issues of eligible senior liabilities by banks and bank holding companies and transaction accounts as announced today under the systemic risk exemption invoked by the FDIC, US Treasury, and the Federal Reserve.
>
> Expand the flow of credit to US consumers and businesses on competitive terms to promote the sustained growth and vitality of the US economy.
>
> Continue to work diligently, under existing programs, to modify the terms of residential mortgages as appropriate to strengthen the health of the US housing market.

45.     On October 28, 2008, as part of its participation in TARP, Goldman raised $10 billion through the sale of cumulative perpetual preferred stock and a warrant that gave the Treasury Department the right to purchase shares of the Company's stock.  The preferred stock had an aggregated liquidation preference of $10 billion and an annual dividend rate (cumulative and payable quarterly in cash) of 5% for the first five years and 9% thereafter.

46.     Also during October 2008, Goldman separately raised $5 billion through the sale of 10% cumulative perpetual preferred stock and a warrant to Berkshire Hathaway Inc. and certain affiliates.

> ### C.     Executive Compensation Restrictions.

47.     TARP recipients, including the Company, were subject to executive compensation restrictions.  The original executive compensation rules set forth in Section 111 of Emergency Economic Stabilization Act of 2008 ("EESA") were amended in February 2009 in the American Recovery and Reinvestment Act of 2009 ("AARA") and have been interpreted and implemented by Treasury regulations and notices.  On June 10, 2009, Treasury released its Interim Final Rule on TARP Standards for Compensation and Corporate Governance (the "Rule"), which "implement[s] the ARRA provisions, consolidates all of the executive-compensation-related provisions that are specifically directed at TARP recipients into a single rule (superseding all prior rules and guidance), and utilizes the discretion granted to the [Treasury] Secretary under the ARRA to adopt additional standards, some of which are adapted from principles set forth" in guidance provided by Treasury in February 2009.

48.     The Rule applies to institutions that meet its definition of a TARP recipient as well as any entity that owns at least 50% of any TARP recipient.  As long as a TARP recipient has an outstanding obligation to Treasury, it must abide by the Rule.

49.     Treasury created the Office of the Special Master for TARP Executive Compensation on June 15, 2009.  The Special Master's responsibilities include the following: (a) review and approve compensation structures and payments for the five senior executive officers and the next 20 most highly paid employees at institutions that received exceptional financial assistance; (b) review and approve compensation structures for the next 75 highest paid employees at institutions that received exceptional financial assistance; (c) review bonuses, retention awards, and other compensation paid to the five senior executive officers and the 20 next most highly compensated employees of each entity that received TARP assistance from the date the entity first received TARP assistance until February 17, 2009, and seek to negotiate

reimbursements where the payment was determined to be inconsistent with the purposes of EESA or TARP, or otherwise contrary to the public interest.

> **D.      Congressional Investigations Related to Subprime Residential Loans and Servicing.**

50.     On May 8, 2007, Individual Defendant Litton informed the Financial Institutions and Consumer Credit Subcommittee of the House Committee on Financial Services:  "[T]he current wave of defaults we are seeing today has little to do with [adjustable rate mortgage] resets.  This initial default wave is a result of early payment defaults associated with the 2005 and 2006 originations and we believe it is merely the tip of the iceberg."

51.     On November 14, 2008, he testified before House Subcommittee on Domestic Policy in a hearing entitled *Is Treasury Using Bailout Funds to Increase Foreclosure Prevention, As Congress Intended?*  Mr. Litton stated, in part:

> In the past year, we have observed several notable trends that are presenting increased challenges to servicers as well as homeowners.
>
> First of all, default rates have increased and have continued to do so at an accelerated rate.
>
> Second, redefault rates on loans that have been previously modified have gone up and are going up at an accelerating rate.
>
> Third, fewer customers are accepting the loan modifications that were being offered, including preapproved streamlined loan modifications.
>
> Fourth, foreclosures on vacant properties have doubled from this time last year.
>
> And, finally, our customers are facing tremendous economic head winds driven by higher incidences of job loss, wage compression and a host of other economic issues.
>
> It is clear to me that we as a servicing industry need to continue to be even more aggressive than we have been with modifying loan terms and finding new ways to get homeowners' payments down even further than we have done already.  We believe that this is good both for homeowners and communities, and it is also good for investors whose loans we are servicing.

52.     The Congressional Oversight Panel ("COP")[3] issued its first report in March 2009 entitled "Foreclosure Crisis:  Working Toward a Solution," which explained problems within the residential mortgage loan servicing industry, in part, as follows:

a.      [W]hen homeowners try to contact their servicers to request a modification, they are often unable to reach them.  Homeowners often have to wait on the phone for hours to get through to a servicer representative at a call center.  For working families in particular, the time involved in trying to contact the servicer can be prohibitive.  Homeowners who are trying to deal with their mortgage during their lunch breaks or between two jobs often give up because they cannot get through to their servicers.

b.      [S]everal servicers have openly acknowledged that they simply were not prepared for the volume of loss mitigation requests that this crisis has generated.

c.      Servicers either lack the staffing to effectively respond to loss mitigation requests or have artificially ramped up capacity at a level that precludes training and oversight of staff.

d.      It is difficult for homeowners to initiate productive discussions with lenders because many servicers lack the capacity to deal with a large volume of modifications.

53.     The COP issued another report in November 2010 entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation," which observes that banks and loan servicers are vulnerable to litigation by homeowners and State attorney generals who claim that homeowners have suffered improper foreclosures.  The report also states that "[e]ven the prospect of such losses could damage a bank's stock price or its ability to raise capital."

54.     On November 23, 2010, the Financial Stability Oversight Council held an open session meeting chaired by Secretary of the Treasury Timothy Geitner.   At that meeting, Assistant Treasury Secretary Michael Barr stated, in part, as follows:

The foreclosure working group has five key objectives:  determining the scope of problems; holding the Companies accountable for fixing these problems; making sure individuals who have been harmed are given redress, and that firms pay

---

[3]   The COP is charged with reporting to Congress on the state of the foreclosure crisis, gauging the adequacy of responses and evaluating the promise of potential responses.

penalties where appropriate for their actions; getting the mortgage servicing industry to do a better job for households in financial difficulty by providing alternatives to foreclosure; and acting in a coordinated and comprehensive way to hold the firms accountable, bring clarity and certainty, and help households.

There are five key areas under review at this time:  First, foreclosure process; second loss mitigation; third, origination putbacks; fourth, securitization trusts; and, lastly, disclosures.

Reviews are ongoing, and we expect to report back to the council at its January meeting with initial findings.  In the interim, let me make a couple of key points.  First, we are working to bring clarity and certainty as quickly as we can, but reviews will take time; and second, the bulk of the examination work to date focused on the foreclosure process has found widespread and, in our judgment, inexcusable breakdowns in basic controls in the foreclosure process.  These problems must be fixed.

Let me provide a brief overview of the extent to the reviews.  Earlier this fall, we formed a foreclosure task force at your request in which 11 federal agencies, including the relevant FSOC [Financial Stability Oversight Council] entities, plus the FTC, the Department of Justice and the Department of Housing and Urban Development have been and are coordinating investigations of the largest mortgage servicers, key service providers such as LPS and MERS, certain law firms and other matters.  The working group is also coordinating closely with the states, both the attorney generals and state bank regulators.

Regulators are conducting on-site foreclosure exams of the largest mortgage servicers.  The exams are designed to test and verify the adequacy and integrity of bank assessments and corrective actions, governance over foreclosures to ensure foreclosures are completed in accordance with applicable legal requirements, and that affidavits and claims are accurate, and to determine whether troubled borrowers were properly considered for loss mitigation activities, such as loan modifications prior to foreclosure.

The scope of work to assess foreclosure governance is extensive, and includes an assessment of each servicer's foreclosure policies and procedures, organizational structure and staffing, vendor management, quality control, loan documentation, including custodial management and foreclosure processes.

Examiners are also conducting interviews with personnel and reviewing samples of individual borrower foreclosure files from all 50 states that include both in-process and completed foreclosures.

Examiners are expected to complete on-site fieldwork by the end of the year.  Once this fieldwork is completed, regulators will aggregate results across

institutions to ensure consistency, prepare supervisory letters, and determine supervisory actions that may be needed.

The regulators will draft a horizontal foreclosure report that identifies the range of industry foreclosure practices and common foreclosure governance, and control weaknesses that need remediation.  The regulators are targeting to complete this work by late January.

In addition to reviewing the foreclosure process, there are also ongoing reviews for compliance with loss mitigation procedures, including intensive reviews with respect to modifications by both FHA and the Treasury Department.

Separate and apart from these foreclosure and modification violations, servicers may face risks from failure to follow investor guidelines for originating loans during the height of the boom.  Origination putbacks at relatively large scale have been occurring for some time, and will likely continue for several years.  There have also been concerns raised regarding whether documentation problems exist with respect to loans in securitization trusts.  Regulators have begun to review compliance by servicers, custodians and trustees with procedures required by pooling and servicing agreements, trust in custodial agreements and related contracts.

In late October, with respect to disclosure, the SEC issued a letter to major institutions to remind them of their disclosure obligations, in light of concerns about potential risks and costs associated with mortgage and foreclosure-related activities or exposures.

In sum, Chairman, major financial institutions are being reviewed for problems across a wide range of issues in foreclosure processing, loss mitigation, origination putbacks, securitization trusts and disclosure requirements.  These reviews are ongoing, and the foreclosure task force will report back to this council at its January meeting.

55.     On December 1, 2010, Daniel K. Tarullo, a member of the Board of Governors of the Federal Reserve, testified before the Senate Committee on Banking, Housing, and Urban Affairs.  He said that preliminary findings from the Federal Reserve's banking examiners "suggest significant weaknesses in risk-management, quality control, audit, and compliance practices as underlying factors contributing to the problems associated with mortgage servicing and foreclosure documentation.  We have also found shortcomings in staff training, coordination among loan modification and foreclosure staff, and management and oversight of third-party service providers, including legal services."  As a result, he concluded that these "widespread"

issues "suggest structural problems in the mortgage servicing industry" and that it "has not been up to the challenge of handling the large volumes of distressed mortgages."[4]

56.     On December 1, 2010, John Walsh, Acting Comptroller of the Currency, testified before the Senate Committee on Banking, Housing, and Urban Affairs, stating that the reported foreclosure improprieties represent "a serious operational breakdown in foreclosure governance and controls that national banks should maintain."  He also noted that on September 29, 2010, the OCC ordered the eight largest national bank servicers to conduct a comprehensive self-assessment of their foreclosure management processes, including file review and affidavit processing and signature.

57.     On December 2, 2010, Julie L. Williams, Chief Counsel and First Senior Deputy Comptroller of the Currency, testified before the House Committee on the Judiciary.  She also noted that six unidentified "large bank servicers have publicly acknowledged deficiencies in their foreclosure processes.   The lapses that have been reported represent a serious operational breakdown in foreclosure governance and controls that national banks should maintain."  She cited a number of breakdowns in the foreclosure processes of the large mortgage loan servicers, including whether the appropriate affidavits were signed if required under state law; whether notaries violated standard procedures (e.g., notarizing documents after they had been signed); and the overall accuracy of information and existence of proper documentation to support a foreclosure proceeding.

58.     On or about March 3, 2011 the largest mortgage loan servicers received a comprehensive settlement term sheet from various federal and state authorities, including state attorneys general, the Justice Department, Federal Trade Commission, Bureau of Consumer Financial Protection, Federal Trade Commission and the Department of Housing and Urban

---

[4]   He also noted a number of possible reasons for the explosion of foreclosures, including "the lack of servicer capacity to execute modifications, purported financial incentives for servicers to foreclose rather than modify, what until recently appeared to be easier execution of foreclosures relative to modifications, limits on the authority of securitization trustees, and conflicts between primary and secondary lien holders."

Development, related to the servicing of owner-occupied properties serving as the primary residence of borrowers (the "Servicer Settlement Demand").

59. The Servicer Settlement Demand outlines a comprehensive set of remedial steps, including those related to the following:

a. standards for affidavits and sworn statements in foreclosure and bankruptcy proceedings;

b. requirements for accuracy and verification of borrower's account information;

c. documentation of note, holder status, and chain of assignment;

d. quality assurance systems/audits;

e. specific loss mitigation requirements, including: the affirmative duty to thoroughly evaluate borrowers for all available loss mitigation options before foreclosure referral; prohibition of dual tracking trial modifications and foreclosures; providing a single point of conduct to borrowers; accuracy of loss mitigation communications with borrowers; independent review of loss mitigation denials;

f. general loss mitigation requirements, including:

(1) maintenance of adequate staffing and systems for tracking borrower documents and information that are relevant to foreclosure, loss mitigation, bankruptcy, and other servicer operations;

(2) maintenance of adequate staffing and caseload limits for employees responsible for handling foreclosure, loss mitigation, bankruptcy, and related communications with borrowers and housing counselors;

(3) establishment of reasonable minimum experience, educational and training requirements for loan modification staff;

(4) electronic documentation of each action taken on a foreclosure, loan modification, bankruptcy, or other servicing file, including all communications with the borrower and other parties;

(5) adoption of incentives and compensation plans that encourage appropriate loss mitigation over foreclosure;

(6) prohibition against making inaccurate payment delinquency reports to credit reporting agencies when borrowers are making timely reduced payments pursuant to a trial or other loan modification agreement;

(7) prohibition against instructing, advising, or recommending that borrowers go into default in order to qualify for loss mitigation relief; and

(8) prohibition against discouraging borrowers from working or communicating with legitimate non-profit housing counseling services.

g. consideration and application of, where appropriate, principal reduction loan modifications;

h. provision of loan modifications, including principal reductions, related to second liens;

i. general requirements for servicing fees, including:

(1) that such fees be bona fide and reasonable, and disclosed to borrowers;

(2) prohibition of default, foreclosure-related, or bankruptcy-related fees while a completed loan modification application is under consideration or being performed as a trial modification; and

(3) prohibition of mark-ups on any third-party fees.

j. specific servicer fee provisions, including:

(1) maintenance of a current schedule of standard or common fees (e.g., nonsufficient fund fees) that is available to borrowers upon request;

(2) collection of fees from borrowers only for reasonable and necessary services actually rendered and fee is expressly authorized and clearly disclosed to borrower, or fee is expressly permitted by law and not prohibited by the loan instrument , or fee is not prohibited by law or loan instruments and is reasonable for a specific service requested by the borrower;

(3) attorneys' fees charged are for work actually done;

      (4)     with respect to late fees, prohibitions of pyramiding, restrictions on attempts to collect late fees, and prohibitions of late fees when the borrower makes timely trial modification payments;

k.     restrictions on third party fees;

l.     restrictions on force-placed insurance

m.     prohibition against engaging in unfair or deceptive business practices or misrepresenting or omitting any material information in connection with the servicing of the loan (including, but not limited to, misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a loan, the terms and conditions of the servicing agreement, loss mitigation options, or the borrower's obligations under the loan); and

n.     adoption of enhanced corporate governance procedures to monitor compliance with the settlement that could include establishment of a compliance committee of the board of directors.

60.     On or about March 28, 2011, several large banks responded to the Servicer Settlement Demand with a counterproposal entitled "Draft Uniform Servicing Standards." This counterproposal, however, rejected many key parts of the settlement demand, and remained silent about—and thus implicitly rejected—many other remedies set forth in the Servicer Settlement Demand, including principal reduction loan modifications, second liens and conflicts of interest, in-sourced vendor fees or force-placed insurance to affiliates, and pyramiding of fees.

61.     On May 25, 2011, *The New York Times* reported that the Federal Reserve Bank of New York began an investigation into Litton, looking at whether it systematically rejected borrowers' efforts to lower their loan payments through government programs. The inquiry arose from a letter sent by an anonymous Litton employee who reportedly accused Litton of consistently denying modifications to loans that qualified for government modifications.

**E.**     **The Company's Presence in the RMBS Business**

62.     In addition to being a mortgage servicer, Goldman also packaged and sold RMBS to investors. Asset-backed securitizations, such as RMBS, distribute risk by pooling cash-producing financial assets and issuing securities backed by those collateral groups. In a RMBS, the cash-producing financial assets are residential mortgage loans.

63.     The most common form of securitization of mortgage loans involves a sponsor-the entity that acquires or originates the mortgage loans and initiates the securitization- and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans.  The trust is generally established pursuant to a Pooling and Servicing Agreement entered into by, among others, the "depositor" for that securitization.  In many instances, the transfer of assets to a trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor … and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transaction."   Asset-Backed Securities, Securities Act Release No. 33-8515, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

64.     RMBS are backed by the underlying mortgage loans and are often created by pooling more than one group of mortgage loans or collateral groups, in which case the trusts issues securities backed by different groups.  For example, a securitization may involve two groups of mortgages, some primarily backed by one group and others primarily by a second group.  Purchasers of securities acquire an ownership interest in the assets of the trust, which in turn owns the loans.  The purchasers of the securities acquire a right to the cash-flows from the designated collateral group.  The cash-flows come from homeowners' payments of principal and interest on the mortgage loans that are held in trusts.

65.     Goldman's mortgage backed securities business significantly increased between 2005 and 2007.  By the end of 2006, Goldman has sponsored approximately $162 billion worth of RMBS, including prime, subprime, FHA/VA/RHS, second liens and home equity lines of credit.  Goldman's deal volume in subprime securitizations saw a specifically large increase going from $3.8 billion in 2004 to a staggering $20.5 billion in 2006.  Goldman had enormous financial incentives to complete as many offerings as quickly as possible without proper regard to accuracy or completeness of the offering documents, or without proper regard to adequate and reasonable due diligence.  GS Mortgage Securities Corp., a wholly owned subsidiary of Goldman, was the depositor in virtually all of Goldman's securitizations and was paid a

percentage of the total dollar amount of the offering upon completion of the securitization. Similarly, Goldman as the underwriter, was paid a commission passed on the amount it received from the sale of securities to the public.

66.     As revealed by the U.S. Senate Subcommittee on Investigations, a March 9, 2007 e-mail from Daniel Sparks, and officer and director of GS Mortgage Securities, as well as head of Goldman's mortgage department, illustrates just how high of a priority Goldman put on packaging and selling its warehouse mortgages, if for no other reason than to quickly get them off Company books: "[o]ur current largest needs are to execute and sell our new issues – CDO's and RMBS – and to sell our other cash trading positions …. I can't overstate the importance to the business of selling these positions and new issues."  U.S. Senate Permanent Subcommittee on Investigations, *Hearing on Wall Street and the Financial Crisis:  The Role of Investment Banks*, Ex. 76 (Apr. 27, 2010).

67.     As noted above, Goldman's strategy to package and sell RMBS was successful. Indeed, between September 2005 and October 2009, Fannie Mae and Freddie Mac purchased $11.1 billion in RMBS in which Goldman served as sponsor, depositor and/or lead underwriter. As discussed below, Fannie Mae, Freddie Mac and the NCUA have filed suit against Goldman related to their RMBS purchases.

68.     Goldman's own actions of shorting the very RMBS that it sold to clients provides additional proof that the Company knew it had included troubled loans in its securitizations that it sold to Fannie Mae, Freddie Mac, certain credit unions and many others.  Goldman bet against the housing market by purchasing credit default swaps ("CDS") on the very RMBS that it sold to its clients.  A CDS allowed Goldman to bet that a RMBS would default or decline in value; while the investor taking the opposite side of the CDS was betting that the RMBS would not default or decline in value.  Goldman having true information about the troubled mortgages that made up the RMBS knew that these investments were not sound, so as these products defaulted, the investor taking the opposite side of the CDS would have to pay Goldman.  The Senate Subcommittee Report highlighted a RMBS that Goldman underwrote and sold to Freddie Mac,

GSAMP-2007-FM2, and then purchased a CDS, betting that the security would default.  As explained in the Senate Subcommittee Report: "Goldman marketed and sold the Fremont securities to its customers, while at the same time purchasing $15 million in CDS contracts referencing some of the Fremont securities it underwrote.  Seven months later by October 2007, the ratings downgrades had begun; by August 2009, every tranche in the GSAMP securitization had been downgraded to junk status."  *Id.* at 516.  Matt Taibbi, a writer for *Rolling Stone* interestingly summed up Goldman's actions as, "…a car dealership that realized it had a whole lot full of cars with faulty breaks.  Instead of announcing a recall, it surged ahead with a two-fold plan to make a fortune: first, by dumping the dangerous products on other people, and second, by taking out life insurance against the fools who bought the deadly cars."[5]

### VII.   DEFENDANTS' WRONGFUL CONDUCT

#### A.   Defendants Knew of Serious Problems With Subprime Residential Mortgage Loans, Including Those Serviced By Litton Loan.

69.   The Individual Defendants' knowledge of the severe deterioration within the subprime residential mortgage loan industry follows from (among other things) the improved market intelligence obtained as a result of the Litton Loan acquisition, findings and Company documents made public by the U.S. Senate Permanent Subcommittee On Investigations, and material risk disclosures within the Company's filings with the SEC.

##### 1.   Documents and findings made public by the U.S. Senate Permanent Subcommittee On Investigations reveal that the Individual Defendants were timely informed of negative trends in the quality of subprime mortgages.

70.   The thousands of pages of documents that the U.S. Senate Permanent Subcommittee On Investigations has made public in connection with its two-year bipartisan investigation into the origins of the financial crisis make it clear that Goldman and other investment banks kept packaging and selling high risk, poor quality RMBS even in a negative

---

[5] Matt Taibbi, *The People v. Goldman Sachs,* Rolling Stone, May 26, 2011.

market, in part because stopping would have meant smaller executive bonuses and even loss of jobs among those handling CDOs, which eventually occurred.

71.     On March 26, 2007, Goldman senior executives gave a presentation to the Board of Directors regarding the Company's subprime mortgage business that highlighted the facts that the Company's business activity included loan servicing and "EPD [early payment default] claims continue to increase as market environment continues to soften."  It also highlighted within the section entitled *Strategic Considerations Regarding Vertical Integration*, "Intelligence [] 'Field level knowledge' of lending environment makes us better risk takers with our capital when buying loans."  [Upon information and belief, "field level knowledge" was a reference to information gleaned through the Company's mortgage servicing business.]

72.     On September 17, 2007 the Board of Directors[6] received another presentation regarding the Company's residential mortgage business describing steps taken to position the Company in the ensuing mortgage credit crisis.  Notably absent from the presentation were any specific steps being taken to ensure the Company's mortgage servicer business was in the position to perform proper default management.

73.     In addition, during November 2007, the Company's Chief Risk Officer (Craig Broderick), Controller (Sarah Smith), and senior members of their staffs met with representatives of the Federal Reserve Bank, the SEC, and the United Kingdom's Financial Services Authority (the "Tri-Lateral Review Group"), to discuss risk management during the financial crisis.  A "Tri-Lateral Combined Comments" internal document set forth talking points prepared by these individuals for the meeting in response to specific written questions the Company received from the Tri-Lateral Review Group.

---

[6] Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Gupta, Johnson, Juliber, and Simmons were directors of the Company at this time.

74.     Ms. Smith's introductory comments included the following:

We first observed disturbing trends in the performance of sub prime debt in late December, early January and began marking down positions at that time.  As a result we became concerned about our long exposure and acted quickly in a number of ways, including putting hedges in place.  We followed these trends closely and continued to mark down sub prime positions throughout 2007 [….]

*   *   *

We supplemented our risk reporting packages as necessary and discussed our mortgage book at every Risk Committee meeting throughout the year.  We've made several presentations to the Board regarding mortgage exposures and will make another tomorrow.

75.     The response to one question ("At what point were senior executives or the Board of Directors made aware of specifics surrounding the impact that the market disruption may have on the firm's business?") was in part as follows:  (a) "There is constant communication from the revenue side and the control side of the firm with the 30th floor.[7]  In addition David/Jerry co-chair FWRC and Lloyd/Gary regularly attend." and, (b) "March '07 Subprime Mortgage Business presentation.  Sept '07 Residential Mortgage presentation."

76.     The response to another question ("What special sessions, if any, were held with the Board of Directors/senior executives, or what reports were shared, to ensure that they understood the specifics related to valuation issues, conduits, structured investment vehicles, leveraged lending, etc.?") was:  (a) "Quarterly PV presentations to the Board"; (b) Weekly Risk Committee Meetings, attended by DViniar and GCohn, and often LBlankfein"; and, (c) Recent meetings with Lloyd & Gary re: pricing".

77.     In November 2007, Blankfein stated in an internal email to Cohn, Viniar, and other Goldman executives: "Of course we didn't dodge the mortgage mess.  We lost money, then made more than we lost because of shorts.  Also, it's not over, so who knows how it will turn out ultimately."

**2.     The Company's risk management governance structure ensured that the Individual Defendants continued to be timely informed of negative trends in the quality of subprime mortgages.**

---

[7] The reference to the 30th floor was to the floor on which Goldman's senior executives then had their offices in the Company's New York headquarters.

78.     During the relevant period Litton Loan had a formal control committee that reviewed risk control functions across the servicing platforms.  Consisting of staff from internal audit, compliance, quality assurance, quality control, the executive resolution team, litigation, and Goldman Sachs members, the committee met monthly to discuss issues and ultimately reported to the internal control department of Goldman Sachs.

79.     Litton Loan's formalized internal audit program applied a multitiered approach when analyzing operational risk to monitor risk of loss due to compliance or servicing errors. The focus was on specific processes affecting operational, regulatory, and financial risks.  The five-person quality control area performed a standard servicing audit.  The chief compliance officer of Litton Loan reviewed and approved the group's testing program, as did a Goldman Sachs compliance officer.  Among the controls to overall audit methodology were:  (a) the internal audit department reported directly to the internal audit deputy of Goldman Sachs Bank USA; (b) the use of the Company's proprietary audit system, known as Foresight; (c) tracking all audit findings in OATS, a proprietary Goldman Sachs system; (d) forwarding all reports to internal audit of Goldman Sachs Bank USA.

80.     Litton Loan's legal department maintained responsibility for tracking all legal actions directed against it.  A senior attorney, reporting to internal general counsel, oversaw the legal department.  Both Litton Loan and Goldman personnel made up Litton Loan's litigation risk management committee, which convened monthly to discuss pending lawsuits, industry litigation trends, and borrower complaints.

81.     Litton Loan's Technology and Oversight Committee consisted of senior management of servicing and Litton's CEO and CFO, and maintained responsibility for initially approving staffing, projects, compliance and other matters.  Final approval resided at Goldman Sachs Bank USA.

82.     Within Litton's Loan Administration department, each of the senior vice presidents reported to the chief operating officer.  The chief operating officer and CFO reported to Litton Loan's president, who ultimately reported to an executive at Goldman Sachs.

83.    Within the context of the Company's Mortgage Business Organization, Litton Loan reported to the Company's residential whole loan trading department, which reported to the Company's mortgages department.

84.    The Company's Internal Audit department (comprised, in part, of executives in the compliance, controller, credit risk management, legal, operational risk management, and technology departments) reported directly to Individual Defendants Blankfein, Cohn, and Viniar, and to the Board as a whole.

85.    The Company's Operational Risk Committee reported to the Firmwide Risk Committee ("FWRC"), was chaired by the chief risk officer of GS Bank USA, and was charged with ongoing development and implementation of operational risk policies, framework and methodologies, and monitoring the effectiveness of operational risk management.

86.    The FWRC reported to the Management Committee, was responsible for monitoring and control of the Company's global financial risks, and was co-chaired by the Chief Financial Officer (Viniar) and another senior managing director from the Company's executive office.  Defendants Blankfein and Cohn frequently attended FWRC meetings.

87.    The Company's Management Committee reported to the Chief Executive Officer (Blankfein), the President (Cohn), and the Chief Financial Officer (Viniar), and was responsible for  overseeing the Company's global activities.  These individuals in turn reported to the Board and its Risk Committee.

88.    During the relevant period, the Company had a standing committee of the Board known as its Risk Committee.  Ultimate responsibility over the Company's risks was the Board's, which oversaw risk both directly and through its Risk Committee.  According to the Risk Committee charter, it assisted "the Board in its oversight of the Company's management of financial and operational risks, including market, credit and liquidity risks."  The Risk Committee chairperson was charged with liaising with the Audit Committee chairperson to assist that committee in its review of the Company's financial and operational risks.  In fulfilling

committee duties and responsibilities, members were charged with considering, among other things, the potential effect of any matter on the Company's reputation

89.     The above-described Company risk management governance structure ensured that increasingly severe problems in subprime residential loans were promptly and regularly communicated to the Individual Defendants.

> **3.     SEC filings during the relevant period all reveal that the Individual Defendants were informed of material risks posed by deteriorating quality of subprime mortgages.**

90.     Throughout the relevant period, the Individual Defendants reviewed and approved of the Company's quarterly and annual reports with the SEC that all identified widespread declines in asset values, including mortgages, as material risks to the Company. For example, on January 27, 2009, Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Gupta, Johnson, Juliber, Mittal, Simmons, and Viniar caused the Company to file its 2008 Form 10-K with the SEC, stating in part:

> Since mid-2007, and particularly during the second half of 2008, the financial services industry and the securities markets generally were materially and adversely affected by significant declines in the values of nearly all asset classes and by a serious lack of liquidity.  This was initially triggered by declines in the values of subprime mortgages, but spread to all mortgage and real estate asset classes, to leveraged bank loans and to nearly all asset classes, including equities [….]

> *   *   *

> […] While lower interest rates, increased volatility, and substantial increases in trading volumes have positively impacted earnings in a number of our trading businesses, declines in asset values, the lack of liquidity, general uncertainty about economic and market activities and a lack of consumer, investor and CEO confidence have negatively impacted many of our other businesses, particularly our investment banking, merchant banking, asset management, credit products, mortgage, leveraged lending and equity principal strategies businesses [….]

91.     On March 1, 2010, Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Gupta, Johnson, Juliber, Mittal, Schiro, Simmons, and Viniar caused the Company to file its 2009 Form 10-K with the SEC, similarly stating in part:

In 2008 and through early 2009, the financial services industry and the securities markets generally were materially and adversely affected by significant declines in the values of nearly all asset classes and by a serious lack of liquidity.  This was initially triggered by declines in the values of subprime mortgages, but spread to all mortgage and real estate asset classes, to leveraged bank loans and to nearly all asset classes, including equities [….]  While the markets have generally stabilized and improved since the first quarter of 2009, asset values for many asset classes have not returned to previous levels.  Business, financial and economic conditions, particularly unemployment levels, lending activities and the housing markets, continue to be negatively impacted by the events of recent years.

\* \* \*

[….]The markets for securitized debt offerings backed by mortgages, loans, credit card receivables and other assets, which for the most part were closed during 2008 and the beginning of 2009, have very recently begun to reopen.

92.     On March 1, 2011, Individual Defendants Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, Mittal, Schiro, Scott, and Viniar caused the Company to file its 2010 Form 10-K with the SEC, making similar risk disclosures as in prior years and stating:

**Foreclosure and Other Mortgage Loan Servicing Practices and Procedures.** The firm has received a number of requests for information from regulators and other agencies, including state attorneys general and banking regulators, as part of an industry-wide focus on the practices of lenders and servicers in connection with foreclosure proceedings and other aspects of mortgage loan servicing practices and procedures.  The requests seek information about the foreclosure and servicing protocols and activities of Litton Loan Servicing LP (Litton), the firm's residential mortgage servicing subsidiary, and any deviations therefrom. The firm is cooperating with the requests and is reviewing Litton's practices in this area.  These inquiries may result in the imposition of fines or other regulatory action.  Litton temporarily suspended evictions and foreclosure and real estate owned sales in a number of states, including those with judicial foreclosure procedures.  Litton has recently resumed some of these activities [….]

**B.      Defendants Caused the Company to Exit TARP Early In Preference for Executive's Personal Financial Interests Ahead of the Company's Residential Borrower Clients.**

93.     On June 17, 2009, the Individual Defendants caused Goldman to exit from TARP early by repaying the $10 billion plus dividends.

94.     In doing so, the Individual Defendants exhibited their preference for the personal financial interests of the Company's most highly compensated employees over the interests of an

important group of the Company's clients – namely, trouble residential borrowers whose loans were being serviced by Litton Loan.

95.     The early TARP exit freed up executive compensation restrictions discussed above from the Special Master's review and determination and obviated the promise to diligently work to stabilize the U.S. housing market.

96.     Recent history suggests that the Individual Defendants did not, before the Company's early exit, first ensure that Litton Loan had sufficient resources, processes, procedures, and controls in place to enable it to properly perform its default management activities.

97.     The Company's mortgage loan modification processes and foreclosures have long been the subject of homeowners' complaints.  Many of these complaints have echoed the same themes articulated by government regulators – e.g., lack of responsiveness to consumer inquiries about residential mortgage loan modifications; advice to troubled borrowers that they needed to default before the Company could assist them with modifications; submission of adverse credit reports to credit agencies with respect to troubled borrowers who were making payments on time or pursuant to modifications; pyramiding of fees; demonstrated unwillingness and/or inability to work in good faith with consumers who are ready, willing, able and qualified to receive such a loan modification; and its problematic foreclosure procedures.

98.     *Financial Times* reported on June 16, 2010 that the Houston chapter of the Better Business Bureau listed nearly 800 complaints in the U.S. against Litton in the past three years. Separately, on a scale of "A+" to "F", the chapter indicates on its website that it assigned Litton an "F" rating.

99.     In mid-June 2011, the U.S. Treasury published the *Making Home Affordable Program Performance Report Through April 2011*.  This report contains a residential mortgage servicer assessment concerning Litton Loan and states that it has areas requiring moderate improvement (including internal controls for program management, reporting, and governance)

as in the prior quarter and that servicer incentives under the program might be withheld absent Litton Loan's demonstrated improvement.

100. In addition, hundreds of homeowners posted their complaints about Litton's loan modification services on internet sites (e.g., consumeraffairs.com) illustrating the continued inadequacy of the Company's infrastructure to deal with troubled loans. See Exhibit A for a sample of consumer complaints against Litton.

101. One of the major reasons Litton was the subject of thousands of complaints from consumers upset about their experiences with loan modifications under HAMP was that Litton was inexcusably understaffed to handle the volume of requests. Prior to the mortgage crisis banks had invested heavily in making new loans and in Goldman's case, packaging those loans and selling them as securities, and they had not devoted enough attention to servicing those loans. As noted in a October 2010 *New York Times* article,

> [e]ven after the housing bubble began to burst, many [servicing departments] languished with inadequate staffing and outmoded technology, despite warnings from regulators. When borrowers began to default in droves, banks found themselves in a never-ending game of catch-up, unable to devote enough manpower to modify, or ease the terms of, loans to millions of customers on the verge of losing their homes. Now banks are ill-equipped to deal [with] the foreclosure process.[8]

This article further concluded that most mortgage servicers were "factorylike" businesses that relied on "workers with high school educations to process monthly payments." Now in order to comply with HAMP and properly service its customer's loan modification requests, Litton and other servicers needed to come up with a custom-made operations that could solve individual homeowners' problems.

102. Investing in people and technology is expensive and it appears that Litton failed to provide adequate investments necessary to honor its obligations under HAMP. In a report

---

[8] Eric Dash and Nelson D. Schwartz, *"Bankers Ignore Signs of Trouble on Foreclosures,"* New York Times, October 15, 2010.

prepared by the Consumer Financial Protection Bureau ("Bureau") entitled, "Perspectives on Settlement Alternatives in Mortgage Servicing," the Bureau concluded that, "[r]ough estimates suggest that the largest servicers may have saved more than $20 billion through under-investment in proper servicing during the crisis.  As a result, a national penalty of roughly $5 billion would seem low."

### C.   The Individual Defendants allowed the Company to utilize "Robo-Signers"

103.   In the fall of 2010, the Attorneys General in at least 49 states, began investigating Litton (and other mortgage servicers) for the practice known as "robo-signing" or using employees to rubber stamp thousands of documents without checking the accuracy of the foreclosure documents.   One Litton employee noted in a deposition with authorities that they "barely had time to see what they were signing."  The employee further confessed that, "I don't know the ins and outs of the loan… I am not a loan officer."[9]

104.    In addition to the Attorneys General, federal regulators also began to investigate Goldman.  In its filing with the SEC, Goldman acknowledged that these investigations may result in fines or other regulatory actions.  After the robo-signing problem was made public, Individual Defendant Viniar reported that Litton had 23,000 mortgages in the foreclosure process and that the Company was undertaking an executive review of its procedures.  Litton temporarily suspended foreclosures pending review.

105.   On May 25, 2011, it was reported that the Federal Reserve Bank of New York (the "Federal Reserve") was investigating Litton for allegation of failing to conduct appropriate reviews before denying borrowers an opportunity to lower mortgage payments through HAMP. It was further reported that certain Litton loan modifications were "denied without proper review under a 'denial sweep' strategy devised to clear a backlog of applications."  The *Financial Times*

---

[9] Id.

reported that, "a person familiar with Litton said he had examined loans that met the criteria for a government modification, but where denied it, sometimes because Litton employees made mistakes in how they calculated the borrower's income. Other loans were denied the modification on the grounds that documents were missing, even though Litton's computer system reflected receipt of the necessary paperwork."[10]

106. On September 1, 2011, the Federal Reserve and Goldman entered into a consent order which it was alleged that Litton had failed in its duties to adequately service its mortgage portfolio. The Federal Reserve accused Goldman of "a pattern of misconduct and negligence relating to deficient practices in residential mortgage loan servicing and foreclosure processing" and said that the Company failed to respond in a "sufficient and timely manner" to the increase foreclosure activity in response to the housing crisis. Specifically The Federal Reserve alleged that Goldman through Litton:

(a) Filed or caused to be filed in state courts and in connection with bankruptcy proceedings in federal courts numerous affidavits executed by employees of Litton or employees of third-party providers making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

(b) Filed or caused to be filed in courts in various states and in connection with bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

(c) Litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage documents were properly endorsed or assigned and, if necessary, in the possession of the appropriate party;

---

[10] Suzanne Kapner, *NY Fed Investigates Goldman*, Financial Times, May 25, 2011.

(d)     Failed to respond in a sufficient and timely manner to the increased level of foreclosures by increasing financial, staffing, and managerial resources to ensure that Litton adequately handled the foreclosure process, and failed to respond in a sufficient and timely manner to the increased level of Loss Mitigation Activities by increasing management and staffing levels to ensure timely, effective and efficient communication with borrowers with respect to Loss Mitigation Activity and foreclosure activities and full exploration of Loss Mitigation options or programs prior to completion of foreclosure activities; and

(e)     Failed to have adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process, including sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services with respect to the Servicing Portfolio.

107.    Under the terms of the Consent Order, Goldman will have to hire an independent consultant to review Litton's 2009 and 2010 foreclosures to identify borrowers who suffered loss as a result of Litton's improper practices.  The Order requires Goldman "to provide remediation to borrowers who suffered financial injury as a result of wrongful foreclosures or other deficiencies."

108.    In a separate agreement with Benjamin M. Lawsky, Superintendent of Financial Services with the New York State Banking Department, Goldman further agreed to forgive 25% of the principal balances for homeowners who are 60 days past due on mortgage payments, which will costs the Company approximately $53 million.  In return, Mr. Lawsky issued a "no objection" letter to Goldman's sale of Litton to Ocwen.  However, under the Consent Order, Goldman will be responsible for paying any civil money penalty assessed by the Federal Reserve.  The Federal Reserve is already on record saying that "monetary penalties" would be appropriate in this case.  Additionally, if Goldman ever re-enters the mortgage servicing business it will have to prior to beginning operation submit acceptable plans, programs, policies and

procedures to the Federal Reserve.  Such plans include provision demonstrating proper Board oversight of risk management, internal audit and compliance with other foreclosure activities.

109.    According to Ocwen's regulatory filings with the SEC, Goldman will still be liable for any fines and penalties which are likely to be imposed by government authorities relating to Litton's foreclosure and servicing practices in connection with the robo-signing settlements. Further, Goldman also agreed to cover certain losses arising from third-party claims with respect to Litton's servicing agreements.   Therefore, Goldman's still retains liability exposure even though the Company is no longer in the mortgage servicing business.

> **D.      The Individual Defendants knowingly included troubled loans in its RMBS without properly disclosing the true nature of the underlying loans.**

110.    In addition to its liability for its foreclosure practices, Goldman has more recently been the subject of lawsuits resulting from its securitization activities.  As noted above, Goldman packaged RMBS and sold them to investors.  Each of these securitizations was sold pursuant to offering documents which containing the underwriting guidelines or statements about the characteristics and credit quality of the mortgage loans which were included in the package.  The allegations in these recently filed complaints, as well as the overwhelming evidence that has been collected against Goldman demonstrates that the Company knowingly included troubled mortgage loans in the securities that they sold without providing the proper disclosures to its clients.  Indeed, the evidence demonstrates that Goldman knowingly made false representations about the quality of the loans collateralizing its RMBS.

111.    Goldman had longstanding relationships with and detailed knowledge about the loan originators from whom the purchased many of the loans included in their RMBS.  This relationship and detailed knowledge allowed Goldman to know which of these loan originators were problematic and had abandoned proper underwriting standards.   Further, Goldman

performed due diligence analysis on the loan originators and the loans included in its securities offerings to ensure compliance with underwriting standards.   As noted in the Senate Subcommittee Report, "Goldman, either directly or through a third party due diligence firm, routinely conducted due diligence review of the mortgage loan pools it bough from lenders or third party brokers for use in its securitizations…."   Therefore, Goldman had or should have had access to the true quality of the loans used to securitize its offerings.   Indeed, Clayton Holdings, Inc. ("Clayton"), one of the third-party due diligence firms hired by Goldman, admitted to the Financial Crisis Inquiry Commission ("FCIC") that between the first quarter of 2006 through second quarter of 2007, it rejected twenty-three percent of the loans Goldman submitted to it as falling outside of the appropriate underwriting guidelines for the securitization it was being reviewed.   Of these rejected loans, Clayton found that twenty nine percent were subsequently included in Goldman securitizations, which were eventually sold to investors like Fannie Mae and Freddie Mac.[11]   Goldman's disregard for nearly one-third of Clayton's rejected loans and inclusion of these loans in their RMBS, without properly disclosing these facts, shows that the Company knew of the misstatements and omissions in its registration statements.

112.   Goldman included in the registration statements for several of the RMBS that it sold to Fannie Mae, Freddie Mac, certain credit unions and others, information concerning the purported underwriting guidelines for the loan originations.   These registration statements claimed to contain accurate and detailed statistical information about the loans which made up each RMBS such as, the average FICO scores of the borrowers, the average loan-to-value ratios, weighted average outstanding principal balances of the loans, debt-to-income ratios, whether loans were for primary residence, second homes or investment property, delinquency rates,

---

[11] "The Financial Crisis Inquiry Report, at 167, Jan. 2011.  The FCIC was established by the Fraud Enforcement and Recovery Act of 2009 to examine causes of the economic crisis in the United States created by the Fraud Enforcement and Recovery Act of 2009

geographic distribution of the loans and whether the loans were for purchases or refinance purposes.  However, Goldman's recent settlement with the Massachusetts Attorney General, as well as other investigatory information that has now been uncovered provides additional evidence that Goldman knew or should have known that many of its statements regarding its securitizations were false.

> ### E. Goldman is the Subject of Investigations and Litigation Resulting from its RMBS Business

113.    Goldman's settlement with the Massachusetts Attorney General in May of 2009, was disclosed by the Defendants in the Company's Form 10-Q filed with the SEC on August 5, 2009, and provides further evidence that Goldman knew, should have known or was reckless in not knowing or further investigating the material omissions and misstatements in its registration statements and other offering materials for many of its RMBS.  Specifically, the Massachusetts Attorney General's investigation focused on whether securitizers such as Goldman:

a.    may have facilitated the origination by others of "unfair" loans under Massachusetts law;

b.    may have failed to ascertain whether loans purchased from originator complied with the originators' stated underwriting guidelines;

c.    may have failed to take sufficient steps to avoid placing problem loans in securitization pools;

d.    may have been aware of allegedly unfair or problem loans;

e.    may have failed to correct inaccurate information in securitization trustee reports concerning repurchases of loans; and

f.    may have failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

Attorney General Coakley said in announcing the settlement that Goldman did not take "sufficient steps to avoid placing problem loans in securitization pools." The settlement required Goldman to provide approximately $50 million in relief to Massachusetts homeowners, along with an additional $10 million paid to the Commonwealth of Massachusetts.

114.    As ample evidence exists that Goldman knowingly included troubled mortgages in many of the RMBS that it sold to its clients, several purchasers including Fannie Mae, Freddie Mac, and the National Credit Union Administration ("NCUA"), have recently sued Goldman alleging material false statements and misleading omissions in the registration statements used to sale the packaged RMBS. The securities that these agencies purchased have now significantly deteriorated in value, leaving these and other purchasers with enormous losses.

115.    Fannie Mae and Freddie Mac also have accused Goldman of providing materially false statements in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §77a, *et seq.* as well as various other state laws, which they allege constitute negligent misrepresentation, common law fraud and aiding and abetting fraud. Fannie Mae and Freddie Mac seek rescission and recovery of the consideration paid, as well as monetary losses, including diminution in value and punitive damages. (Plaintiffs incorporate by reference allegations in Fannie Mae and Freddie Mac's Complaint against Goldman, CV # 11-CIV-6198.)

116.    The NCUA also alleges Goldman made numerous material misrepresentations in its offering documents and is seeking to recover losses on a $50 billion portfolio of assets that the agency inherited when it seized five large, failing wholesale credit unions. NCUA alleges that the mortgage originators abandoned underwriting standards, causing the credit unions to believe the investment risk were minimal, when actually these securities were "destined from inception to perform poorly."

117.    Currently, the New York Attorney General and the Manhattan District Attorney's Office are both investigating Goldman's underwriting practices.  Having underwritten billions of dollars worth of securities collateralized by subprime mortgages, coupled with the settlement reached by the Massachusetts, Defendants can expect many more lawsuits, in addition to those by Fannie Mae, Freddie MAC and the NCUA, related to its misrepresentations and omissions in its offering documents.  Therefore, the Defendants actions have again subjected Goldman to financial liability and reputational harm.

118.    On February 17, 2009, the parties to the certified nationwide class action lawsuit brought by homeowners, styled *Schaffer v. Litton Loan Servicing, LP,* Case No. CV 05-07673 (C.D. Cal.), jointly filed a notice of settlement of claims based on alleged violations of the Real Estate Settlement Procedures Act.  Those claims related to Litton's alleged improper imposition of late fees and/or treatment of homeowner payments as late during the 60-day grace period after the effective dates of loan transfers when borrowers timely sent mortgage payments to their old servicer.

**F.    The Individual Defendants have caused damages to Goldman**

119.    As a result of the Individual Defendants breaches of loyalty and misconduct, Goldman has been and continues to be subject to civil liability, regulatory fines and penalties, investigation costs, legal fees and possibly criminal liability.  The cost incurred in having to respond to investigations by numerous state and federal agencies; the fines and penalties already accessed and those reasonably anticipated; the costs of defending multiple legal actions, including those by the States Attorneys General, various federal government agencies, the robo-signing scandal, as well as private securities fraud class actions will likely result in Goldman spending hundreds of millions if not billions of dollars.

120.    Both the Consent Order with the Federal Reserve and the purchase agreement with Ocwen, which the Board authorized Goldman to enter, require that the Company maintain certain duties and liability. In fact, under the terms of the Consent Order with the Federal Reserve, Goldman has to take steps to ensure that, following the sale of Litton to Ocwen, it can have "access to information, documents, and personnel of Ocwen and its subsidiaries (including Litton) with respect to the Servicing Portfolio sufficient to comply with the requirement of this Order."  Additionally, this Order states that Goldman, "…shall be responsible for the payment of any civil money penalties assessed by the Board of Governors for the conduct described above that Goldman Sachs, through Litton, allegedly engaged in in connection with the process leading to certain foreclosures involving the Servicing Portfolio."

121.    The Defendants clearly recognize that their actions and the actions of other Company officials are causing significant damages to the Company as has been noted in the 10-K for the fiscal year ending December 31, 2010:

> ***We may be adversely affected by increased governmental and regulatory scrutiny or negative publicity.***
>
> Governmental scrutiny from regulators, legislative bodies and law enforcement agencies with respect to matters relating to compensation, our business practices, our past actions and other matters has increased dramatically in the past several years. The financial crisis and the current political and public sentiment regarding financial institutions has resulted in a significant amount of adverse press coverage, as well as adverse statements or charges by regulators or other government officials. Press coverage and other public statements that assert some form of wrongdoing often result in some type of investigation by regulators, legislators and law enforcement officials or in lawsuits. Responding to these investigations and lawsuits, regardless of the ultimate outcome of the proceeding, is time consuming and expensive and can divert the time and effort of our senior management from our business. Penalties and fines sought by regulatory authorities have increased substantially over the last several years, and certain regulators have been more likely in recent years to commence enforcement actions or to advance or support legislation targeted at the financial services industry. Adverse publicity, governmental scrutiny and legal and enforcement proceedings can

also have a negative impact on our reputation and on the morale and performance of our employees, which could adversely affect our businesses and results of operations.

122.    However, as some industry experts have noted, the biggest threat to Goldman may not be the large sums of money it will have to pay in penalties and legal settlements, the biggest threat may be the potential impact of the whole affair on its reputation, client relationships and employee morale.  As previously noted, the Board recognizes that Goldman's reputation is its strongest asset.  The actions of the Individual Defendants have caused and will continue to cause significant harm to Goldman's reputation, and it will be "most difficult to restore."  Therefore, the true damage to Goldman resulting from the Individual Defendant's breaches of fiduciary duties and misconduct will easily measure in the billions of dollars and have long term, negative effects on the Company.

## VIII.   DERIVATIVE ACTION ALLEGATIONS

123.    Plaintiff brings this action derivatively on behalf of and for the benefit of Goldman Sachs to redress injuries suffered, and yet to be suffered, by it as a direct and proximate result of the breaches of fiduciary duty alleged herein.  The Company is named as a nominal defendant solely in a derivative capacity.

124.    Plaintiffs purchased shares of Goldman Sachs common stock during the relevant period and they have held such shares continuously since they purchased them.  Thus, Plaintiff was a Goldman Sachs shareholders at the time of the wrongdoing complained of herein.  Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in this litigation, and intends to retain their shares of Goldman Sachs throughout the duration of this litigation.

125.    The wrongful acts complained of herein subject, and will persist in subjecting Goldman Sachs to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

126.    The wrongful actions complained of herein were unlawfully concealed from the Company's shareholders.

## IX.    DEMAND EXCUSED ALLEGATIONS

127.    Further, Plaintiffs did not make a demand on the shareholders of Goldman to institute this action because such a demand would have been a futile and useless act for at least the following reasons:

a.    Goldman is a publicly-held company with millions of shares that are issued and outstanding;

b.    making a demand on such a number of shareholders would be impracticable and impossible for Plaintiff, who has no way of determining the names, addresses or phone numbers of such shareholders;

c.    making a demand on all shareholders would force Plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

128.    Moreover, of the eleven Director Defendants, a majority are either employees of Goldman (Blankfein and Cohn) or have significant financial relationships with Goldman or with the Goldman Sachs Foundation (the "Foundation") controlled by Goldman management, and therefore cannot act independently.[12]

129.    More specifically, Defendant Dahlback chairs the investment committee of certain funds managed by EQT, a private equity firm, and receives approximately 1% of the total

---

[12]The Foundation is a New York not-for-profit corporation that was organized by the Company in 1999 and that is controlled by Goldman's management.  As discussed herein, Five of the nine non-employee directors on Goldman's Board are members of boards of exempt organizations to which the Foundation has made substantial donations.

profits of each such fund in connection with his role.  Dahlback also serves as a limited partner investor in certain of these EQT funds, owning approximately 1% of each such fund.  Certain funds managed by a Goldman Sachs subsidiary have an aggregate □18.7 million investment in one EQT fund and an aggregate □30 million investment in another EQT fund.  In connection with these investments, Goldman Sachs-managed funds made aggregate capital contributions of approximately $23 in 2006 and 2007, which included approximately $780,000 of management fees, to the EQT funds.  Similarly, in 2007 through 2009, Goldman-Sachs managed funds made capital contributions of approximately □21.7 million, which included approximately □2.21 million of management fees, to the EQT funds.  In addition, in July 2005, certain EQT funds and certain funds managed by Goldman co-invested in a $5.3 billion acquisition, with the EQT fund investing approximately $730 million and Goldman Sachs-managed funds investing approximately $599 million.  Also during fiscal 2007, Dahlback, through his interest in the EQT funds, received distributions aggregating approximately $8.6 million upon the distribution of certain EQT fund investments in transaction aggregating approximately $4.5 billion for which affiliates of Goldman performed investment banking services.

130.    Mr. Friedman has served, since June 2006, as Chairman of Stone Point Capital LLC ("Stone Point"), a private equity firm, also serving as a Senior Advisor at Stone Point since May 2005.  Friedman is also a member of the investment committee of Trident II, L.P. ("Trident II"), a Stone Point-managed private equity fund.  In fiscal year 2005, certain funds managed by a Goldman Sachs subsidiary made an aggregate investment of $42.5 million in Trident II, which has total capital commitments of approximately $1.3 billion.  In connection with this investment, in fiscal years 2005 and 2006, Goldman Sachs-managed funds paid approximately $257,000 in management fees.  While Friedman had no equity or carried interest in Trident II, certain of his

family members, as the beneficiaries of a trust that holds a limited partnership interest in the general partner of Trident II, received approximately 1.5% of the total profits of Trident II in 2005 and 2006. Additionally, in 2005, Friedman was a limited partner, owning approximately 2.5%, in funds managed by Insight Venture Partners ("Insight"), a private equity firm. At this same time, Friedman served as senior advisor to Insight and received approximately 1% of the total profits of certain funds managed by Insight in connection with his role. Certain funds managed by a Goldman Sachs subsidiary had an aggregate investment of $20 million in 2005 in the Insight funds in which Friedman had an interest and made capital contributions of $4.5 million, which included approximately $310,000 of management fees, to the Insight funds.

131. Mr. Mittal is the Chairman and CEO of ArcelorMittal and beneficially owns approximately 41% of the outstanding common shares of ArcelorMittal. Goldman and its affiliates provide financial advisory, lending, investment, banking, trading, and other financial services to ArcelorMittal and its affiliates. Goldman participated in a approximately □17 billion ArcelorMittal credit facility, agreeing to lend up to €500 million, from December 2006 until the termination of its final commitment under the facility in November 2009. From the end of fiscal 2008 through the end of fiscal 2009, the largest loan outstanding by Goldman Sachs was approximately €98 million, and ArcelorMittal paid interest to Goldman Sachs totaling approximately €1.5 million at an average rate of Euribor/Libor + 33.46 basis points with respect to a commitment under the facility that terminated in August 2009 and an average rate of Euribor/Libor + 34.43 basis points with respect to the commitment that terminated in November 2009. Since May 2008, Goldman Sachs has participated in an approximately $4 billion ArcelorMittal credit facility, agreeing to lend up to $166.75 million at an interest rate of between Euribor/Libor + 45 and + 90 basis points and up to $83.25 million at an interest rate of between

Euribor/Libor + 35 and + 80 basis points. Since April 2009, Goldman Sachs has participated in an approximately $3.25 billion ArcelorMittal credit facility, which has the effect, with respect to the participation of Goldman Sachs, of extending the maturity of part of Goldman Sachs' existing commitment to lend under the $4 billion credit facility described above. In May 2009, Goldman Sachs acted as sole global coordinator and joint bookrunner in connection with offerings by ArcelorMittal of approximately $3.2 billion of common stock and approximately $800 million of convertible senior notes, and acted as a passive bookrunner in connection with an offering by ArcelorMittal of approximately $2 billion of senior notes.

132.    In addition to the foregoing, five of the nine non-employee directors on Goldman's board are members of boards of exempt organizations to which the Foundation has made substantial donations.

133.    Defendant Bryan chaired a successful campaign to raise $100 million to renovate the Chicago Lyric Opera House and Orchestra Hall, to which Goldman made substantial contributions.  He is a life trustee of the University of Chicago, a position that entails fundraising obligations, to which the Foundation donated $200,000 in 2006 and allocated another $200,000 in 2007.

134.    Defendant Johnson is and was in 2006 an honorary trustee of the Brookings Institution, a position that entails fundraising obligations, to which the Foundation donated $100,000 in 2006.

135.    Defendant Friedman is an emeritus trustee of Columbia University, a position that entails fundraising obligations.  Since 2002, the Foundation has donated at least $640,000 to support an MBA business plan competition and education program at Columbia University.  In 2007, the Foundation allocated another $125,000 to Columbia University.

136.    Defendant Juliber is a member of the board of Girls Incorporated, a position that entails fundraising obligations, to which the Foundation allocated $400,000 in donations and paid $200,000 in 2006 and 2007.

137.    Defendant Simmons, as president of Brown University, is charged with certain fundraising obligations.   In conjunction with Brown's University Swearer Center for Public Service, the Foundation allocated $100,000 in 2006 and paid $100,000 in 2007.

138.    Thus, Defendants Bryan, Friedman, Johnson, Juliber, and Simmons have all been assisted in their charitable fund raising responsibilities by contributions from the Foundation, which is funded by the Company and controlled by the Company's management.

139.    Accordingly, a majority of the Board is interested and lacks independence.

140.    Of the current Board members, eight (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, and Juliber) were Company directors when the Board discussed in fall 2007 the mortgage crisis and tactical steps taken by the Company (including, but not limited to the Company's short positions).   These Defendants cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to ensure that the Company's default loan management resources, procedures, and controls were sufficient for it to properly perform that function.

141.    Of the current Board members, eight (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber) authorized Blankfein to enter into the "Major Financial Institution Participation Commitment" in late October 2008 promising regulators that Goldman would "[c]ontinue to work diligently, under existing programs, to modify the terms of residential mortgages as appropriate to strengthen the health of the U.S. housing market."   These defendants

cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to perform their promise as discussed herein.

142.    Of the current Board members, eight (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, and Mittal) highlighted a variety of risks facing the Company within its 2008 Form 10-K as set forth above.  With respect to the 2009 and 2010 Forms 10-K, nine of the current Board members (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, Mittal, and Schiro) highlighted similar and additional risks to the Company as set forth above.  These Defendants cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to ensure that the Company's default loan management resources, procedures, and controls were sufficient for it to properly perform that function.

143.    Of the current Board members, ten (Blankfein, Bryan, Cohn, Dahlback, Friedman, George, Johnson, Juliber, Mittal, Schiro) were Company directors when it caused its mortgage servicing subsidiary to execute the Servicer Participation Agreement in August 2009.  These defendants cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to ensure that the Company's default loan management resources, procedures, and controls were sufficient for it to properly perform that function.

144.    Of the current Board members, nine (Blankfein, Brian, Cohn, Dahlback, Friedman, George, Johnson, Juliber, and Mittal) were Company directors when the Company agreed to settle the *Schaffer* matter.  These defendants cannot impartially consider a demand because they face a substantial likelihood of liability, having failed to ensure that the Company's default loan management resources, procedures, and controls were sufficient for it to properly perform that function.

145.   The Board has made a number of decisions that give rise to a reasonable doubt that they are entitled to protection under the business judgment rule.  Such decisions include, *inter alia*, (a) causing the company to accept $10 billion in taxpayer money in exchange for contracting to participate in an unprecedented federal government program designed to provide relief to the nation's crippled housing market by modifying eligible mortgages of taxpayers on the brink of foreclosure, yet inexcusably breaching their commitments and obligations under the contract; (b) allowing  the Company to engage in the illegal and unconscionable practice of "robo signing" or the robotic, mass production of false and forged mortgage assignments, satisfactions, affidavits and other foreclosure related documents by persons without knowledge of the facts attested to and without checking the accuracy of the foreclosure documents, often resulting in improper and illegal foreclosure of taxpayers' homes; and (c) causing the company to violate applicable laws by knowingly and intentionally packaging troubled loans in real estate mortgage backed securities ("RMBS") that it sold to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation as well as other unsuspecting investors without properly disclosing the true nature of the underlying loans and through material misrepresentations in various offering documents.

146.   On information and belief, all current Board members received the servicer settlement demand referenced herein and rejected material provisions of it.

147.   Accordingly, a majority of the Board is interested and lacks independence and all current Board members have demonstrated their unwillingness and inability to address the claims alleged herein seeking pecuniary and other relief to compensate the Company for the wrongdoing alleged herein.  Thus, Plaintiff did not make a demand on the current Board before instituting this action because the factual allegations herein create a reasonable doubt that a

majority of the Director Defendants could have properly exercised independent and disinterested business judgment in responding to such a demand.

## COUNT I
## DERATIVELY ON BEHALF OF GOLDMAN

**(Against the Individual Defendants For Breach of Fiduciary Duty of Loyalty)**

148.    Plaintiffs incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

149.    At all relevant times the Individual Defendants owed the utmost fiduciary duty of loyalty to the Company and its shareholders.

150.    The Individual Defendants' duty of loyalty required that they act in good faith to protect the best interests of the Company and its shareholders.

151.    At all relevant times, the Individual Defendants knew that the Company's exposure to nonprime residential loans, the decline in the housing market, and Company agreements with the federal government required that they ensure the Company had sufficient resources, processes and controls in place to perform proper residential default loan management.

152.    At all relevant times, the Individual Defendants failed to timely take necessary remedial steps to address the Company's deficient default loan management internal controls and resources, failed to compensate the Company for their own misconduct, and failed to pursue remedies against other persons who may be responsible for the wrongdoing alleged herein.

153.    At all relevant times, the Individual Defendants, in violation of the law, knew, were grossly derelict in not knowing and/or intentionally included material misrepresentations and omissions about the true characteristics and credit worthiness of the mortgages underlying

the RMBS that the Company packaged and sold to investors, pursuant to false registration statements.

154.    Accordingly, the Individual Defendants breached their duties of loyalty by acting unfaithfully to the Company and its shareholders in numerous ways as described above.

155.    The Individual Defendants are not entitled to any protections that may otherwise have been afforded by the business judgment rule.

## COUNT II

## CONTRIBUTION AND INDEMINFICATION

### (Against the Individual Defendants)

156.    Plaintiffs incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

157.    Goldman is alleged to be liable to various persons, entities and/or classes by virtue of the same facts and circumstances as are alleged herein which gives rise to the individual Defendants' liability to Goldman.

158.    Goldman's alleged liability on account of the wrongful acts and practices related to the misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants in connection with all such claims that have been, are, or may be in the future asserted against Goldman by virtue of the Individual Defendants' misconduct and breaches of fiduciary duty.    Plaintiffs on behalf of Goldman have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, on behalf of Goldman, Plaintiffs prays for judgment as follows:

A.      A judgment finding that a shareholder demand on the B of A Board would have been a futile and useless act;

B.      A judgment finding that the Individual Defendants have breached their fiduciary duties to the Company;

C.      A judgment against all of the Individual Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the breaches of fiduciary duties by each Individual Defendant as alleged herein, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.      A judgment requiring the Individual Defendants to return to the Company all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of the fiduciary duties they owed to the Company;

E.      Directing the Individual Defendants to establish, maintain, and fully fund effective compliance programs to ensure that B of A's directors, officers and employees do not engage in wrongful and illegal practices;

F.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendant's misconduct, as permitted by law;

G.      Awarding to Plaintiffs the costs and disbursements of this consolidated action, including reasonable attorneys' and experts' fees and expenses;

H.      Granting any such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all applicable issues.

Dated:  December 20, 2011

Respectfully submitted,

SMITH SEGURA & RAPHAEL, LLP
Brian D. Brooks
bbrooks@ssrllp.com
260 Madison Avenue, 8th Floor
New York, NY  10016
Phone:  (646) 216-2124
Fax:  (318) 487-1741

*Proposed Liaison Counsel*

EMERSON POYNTER LLP
John G. Emerson
jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX 77058-2610
Tel:    (281) 488-8854
Fax:   (281) 488-8867

Scott E. Poynter
scott@emersonpoynter.com
500 President Clinton Ave., St. 305
Little Rock, AR 72201
Tel: (501) 907-2555
Fax: (501) 907-2556

JIGARJIAN LAW OFFICE
*Robert A. Jigarjian Of Counsel to*
*Emerson Poynter, LLP*
jigarjianlaw@gmail.com
128 Tunstead Avenue
San Anselmo, CA 94960
Tel: (415) 341-6660

*Attorneys for Plaintiffs Michael G.*
*Brautigam and Proposed Co-Lead*
*Counsel*

CARNEY  WILLIAMS BATES PULLIAM
 & BOWMAN, PLLC
Darrin Williams
dwilliams@carneywilliams.com
11311 Arcade Dr., Suite 200
Little Rock, AR 72211
Phone:  (501) 312-8500
Fax:  (501) 312-8505

*Attorneys for Plaintiffs Retirement & Relief*
*System of the City of Birmingham, Alabama*
*and Proposed Co-Lead Counsel*

## Exhibit A

Consumer Complaints against Litton Loan Servicing, Inc.

8/19/11- Candice of Moosup, CT

Litton took our loan on our home. We fell behind. We faxed, mailed, faxed, and mailed again and again the same information over and over to get into the Making Homes Affordable. I filed a complaint thru the Putnam CT Court, Litton was not responding to me. Finally, we got into mediation. We made our payments but they sent them back because paperwork was still missing, according to them.

Litton was taking as much time as the time allowed them to. Litton was faxing me old paperwork and that wasn't even the plan we were working on. I would call them and ask, "What do you not have?" I was told what they needed me to send. This happened so many times that I would call them back, 2 maybe 3 times in a row to ask, "What do you not have?" again, and, "Don't you know?" this representative said, "We need this and that." This was not what the last representative said. So, I call back again to verify what they needed and this rep would tell me that they already have the other items that the 2 reps before them requested. However, something different was missing.

It was like a game to them. We send payments and Litton held on to them as long as they could, then they would send the payment back because again, some paper was missing. We send another payment, same thing over and over. This is just the nutshell.

Three years later, I have been sold off to another company who has, in 6 months, actually done something with our mortgage. Litton had our monthly income at 2,000.00. Do you really think that if I made that kind of money in one month, I would have fallen behind? No, but that's how it went. Litton Loan took our paperwork and played with it to draw things out and mess me up - really great with these fees and fees, oh and yeah, more fees. Apparently, I can't submit this unless I give a very unworthy star, so please, this star is not by choice. I would only have one choice of a rating for Litton Loan Service and that is a big 0!

6/2/11- Ryan of Arvada, CO

Hi,

I am looking for help with a "Making home affordable" Loan modification nightmare that we have been dealing with Litton Loan LLC I will try to explain bullet points without creating a novel.

We qualify for the loan modification no problem and were approved on our second mortgage with fifth third bank no problem filled out one form sent it in with requested documents and it was done in a week. Very professional friendly staff.

Litton Loan LLC complete nightmare:

Started the loan modification over 20 months ago. We filled out the original forms sent in all documents requested and they have been asking for more and more documents every time. We have sent 100's of copies of everything and it's never enough they always have "something else they need" Some mistake we need to fix or send written statements. They are all very rude are not friendly to deal with and stall stall stall is the game they are playing.

It's always a new customer service agent to deal with. And I guarantee they are trying to make it so frustrating that we just give up. My wife and I have sent them everything they ask for over and over for the last 2 years. We Dont know what else to do?

We have sent 2 years of bank statements from all 4 accounts that we had to hand sign the bottom of every page and send back again? . Then they made a mistake when they thought we had an account that did not exist? we sent them statements from all accounts as requested and we have to send a written statement saying "the **" account that they made up does not exist"????? They need proof of unemployment, then proof of unemployment ending? They have been stringing us along over and over and making us wait weeks to mail stuff back and forth. They never call back when they promise they will. They never send us anything telling us what they need we have to call over and over again to check and see what the new demand is and then wait weeks for it to "show up in the system after faxing"???? And then learn about more and more demands its ridiculous! Spent over $100 on faxing docs. Every time they assure us they have everything and just need this "one more hoop to jump through" But its never ending. HELP?

1/11/11 - Stephen of Warwick, RI

I have been paying modified loan payment to Litton Loan for over 1 year. I have made my payments on time. I have been told, pretty much on a monthly basis that there was another document missing. They have taken so long that I have had to resend documentation multiple times. Even though I continually made the modified payments on time, they continued to add late fees and charges.

Now they have decided to not do the modification, based on some bogus missing documents. The person that talks to you, this T.J.*****, is not in

2

underwriting. I doubt they even have an underwriting department. Now I am sure they are going to attempt to foreclose and I do not know what to do.

I do not know who I can contact. I almost knew, when it took over a year to do the modification, that the company was going to try something sneaky like this.

What can I do?

12/26/10 - Phyllis of Plant City, FL

Last December I filled out all paperwork sent by Litton to see if I qualified for the HAMP program. I had to refax the last page of the Hardship affidavit because they said it was not there, so now we were in January. In February they sent me a trial loan program, and reduce my payment from $1444 to $1083.00, but I was still waiting for approval.

The trial was for Feb, March, April and May...and I did as I was told. In May, they took my mortgage payment of $1083.00 and dispersed it to the Feb/March and April deficit, and when I called they said I owed $1444 for May, which I had just paid. I did not get any type of denial, but after calling, they said as of 5/10/10 I was denied because I did not qualify for the hamp, however if I send them all the paperwork again, they could approve me for a Custom Loan that they were offering.

In May I had to send another payment, and all paperwork to them. This included 2 current pay stubs, current bank statements, 2008/2009 tax returns, a 4506-T form, a harship affidavit, a letter from my employer verifying my income, all credit card bills, utility bills, pretty much everything you could think of. I called them every 2 weeks for over 1 year. Numerous times since then they would always say they were missing paperwork. Numerous times I have faxed and confirmed that they received it.

Finally in October they sent a letter stating I was not eligible because they did not receive all paperwork, I argued with them to no avail. Then they faxed me someone else's W2 form with their name, social, address, income, and I called to tell them of their error. They are a collection agency also, and violated the Fair Debt Act by sending me someones private information. On 12/9/10 I confirmed that all info was on file and was told they were verifying my income, again.

On Friday 12/24/10 I received a letter from Litton, they sold my loan to another company Green Tree Servicing P.O.Box 94710 Palatine IL 60094. So I wasted 1 year trying to get help to lower my interest rates and they sold my mortgage! Now what the hell am I suppose to do? I would like to

3

contact the person whose information I called and have them reported, but that does not help me out.

I have struggled these past 2 years to keep up with all my debt, now I am at a loss.

What do I do?

9/30/10 - Janet of Westbrookville, NY

I was badly injured in an auto accident and became disabled. I contacted Litton Loan servicing immediately to advise them my income would be greatly reduced and I would be unable to meet the mortgage payments. I had used all my savings and other resources to try and keep up but due to the lengthy time it takes to get disability I had no income for 2 years.

I placed the property on the market, but the real estate market had taken a dive at the time and I could not sell it. I asked if i could do a Deed in Lieu of Foreclosure to avoid becoming delinquent. I was told I had to try a loan modification, which I knew i would not be approved for, due to my lack of income. Over and over again i requested the deed in lieu be granted to avoid the cost of attorneys. I mean why wouldn't they want to save the costs of foreclosure by a voluntary deed in lieu.

Well I jumped through all the hoops they put up and they continued to the foreclosure process. Luckily in Ny they have the Court will order a conference to work out a way to save your home. I went to the conference and explained my circumstances to the judgeand he could not believe that for the same outcome, possession of the property, Litton was dragging their feet in approving the Deed in Lieu.

Litton finally approved me, several days after the court appearance. I was told the foreclosure attorneys would send me the documents. I waited for over a month and contacted Litton. I was told the attorneys had sent them. I had moved from the premises and the house was now vacant.

The papers were delivered by Fed-Ex to a vacant house and left in the basement door. We finally found them. Enclosed in the packet was an affidavit i was to execute and have notorized which stated that in return for the executed deed I was released from all debts, charges, fees, attorneys fee, or obligations relating to this loan and they would clear my record.

I executed the documents on May 19, 2010 and sent them fed-ex to litton's attorneys. Thjey recieved them n may 27, 2010. I waited for the satisfaction/ idscharge of mortgage and in June when I did not recieve it I contacted Litton. I was told they did not know the deed had been executed and

recieved by the attorneys. The attorney's office was holding the documents awaiting the funds to pay the transfer taxes, and failed to nootify Litton. So finally 2 months later the deed was filed. Problem should have been solved.

No the mortgage still remains filed on the property I no longer own, Litton keeps reporting to the credit agencies that I am a collections account, forfeited a deed and still in default for 55, 319. and have the remaining balance owned for the full mortgage. I have spent months trying to get this matter straightened out. Litton has told me they are not going to change any information until they sell the property. This is totally in breach of the agreement I signed with them. If I had known they would not honor their obligations in the agreement i would have asked the Judge who dismissed the foreclosure action to issue a discharge of mortgage in his order.

So now I am at my wits end, my credit reports are inaccurate and according to the County records I still have a mortgage with Litton Loan servicing. I have made a formal complaint with the NYS Banking Dept. I have read all of the complaints other people have posted regarding Litton Loan Servicing, why can't someone do something to bring them in compliance with the law?

9/27/10 - Jason of Lake Havasu City, AZ

Litton Loan servicing I feel has done nothing but jerk me around and waste alot of my time with there so called Morgage modifacation program.For about one year I have been dealing With litton loan,wtrying to make my loan more affordable,My wife and I are selfemployed and I have been paying on our first home for about 5 years now.We would like to stay in our home, But litton does not seem to want the same thing. Our morgage was sold to this terrible company, We did not choose them as are lender

.My credit score is not the best, and I feel that litton loan is tacking advantage of that fact. First litton loan Put me on a three month trial that turned into a seven month trial, I was paying more then usual during this trial period, Becouse they required escrow payment,I just could not aford to pay more, to litton while I was still paying my Land tax and insurance out of my pocket, I keep making the payment after the seven months but did not include the escrow, Litton then denied my modifacation becouse i did not send my escrow in with the payment, even thowe i was past the three month trial. So then They put me on another loan modification program, That they denid me after four or five months stating they did not recieve all the paper work they ask for,

That is not right becouse I sent all the information they requested, at least three times, I mailed it, I fax it all to the address they gave me and to the number they gave me. And after they denied me for that loan modification, They said I owed for a missed payment I was made to pay over the phone

935.00, I explained That there records must be wrong, They said i must pay the missed payment or they will report it to the credit scoring companys,So i payed and then requested a detailed payment history two months ago, still have not recievced it? It seems Litton puts on the front that they want to help Familys stay in there homes, But its been My experience in dealing with litton loan that they do not care if me, my wife or our 7 year old son lives on the street or not.

Becouse litton just keeps on jerking us around instead of just modifying the loan , Our house is worth half of what it was when i brought it, but to me and my family this is our home and we would like to stay. But if litton loan is not willing to work with people , I guess we will have to go homeless,and walk away from our home and then put are hands out for wellfare. Becouse i am about to give up trying so hard to make the payments, its to much stress on the family, I also know This is not the only story like this about litton loan servicing.

8/12/10 - Lee of Tremont, MS

My story is the same as all the others that got hooked by Litton, the insurance scam, the payment scam, and all the inflated fees scam. In the end I lost my house because my health got so bad that I didn't have the strength or money to keep fighting them.

5/13/10 - ROBERT of APO

Last year June 2009 while on vacation from Iraq, I was late in making my mortage payment. I called Litton and spoke with a rep who said that the payment wouldn't be reported as late. I just recently found out that it was reported late. In the following months of July and Aug 2009, I made online billpay payments ontime which were kicked back to my bank account. Found out there was a problem with Litton's computer system. I called reps each time to make sure that I wouldn't be charged late fees and that no negative marks would appear on my credit report. Litton assured me that those payments wouldn't be recoreded as late payments.

I also found out that these 2 payments were also recorded as late to the credit agencies. So now my credit report shows me being late for Jun/Jul and Aug of 2009. Over the past few days I've been calling Litton and trying to get this resolved. I asked for them to simply write a letter or send me an email saying that it wasn't my fault that the payments were late. I didn't need them to take the bad marks off my credit report, only to send me a line or 2 saying that the late marks weren't my fault. Last month, my payment was kicked back again due to Litton computer errors.

I again had to stay on top of this to make sure that I wasn't charged a late fee, only this time they called my job nearly everyday for 2 weeks...asking about a payment that was already made through my billpay. Since then, they call or email almost everyday after the 1st...supposedly as a reminder of my due payment. I told them flatout that it was harassment as every company has grace periods to allow for mail delivery and bank processing times. Overall I'm glad that this company operates the way it does...otherwise, I wouldn't have searched for other lenders. I have now found another lender at a much lower rate who will assume my mortage this sept. I see the consequences as good since their incompetence led me to look elsewhere, and now I've found a lender with a much, much lower rate that will almost cut my mortage payment in half.

5/12/10 - Robert of Minneola, FL

We entered a loan modification procedure with Litton, and we have complied with all requests and saved all documentation, and every time we call we get the run around or get told something different. They tell my husband they didn't receive documents that we have signatures for, then when he proves it they admit they DID receive them. We have perfect credit and have always paid our bills and mortgage payments on time, and now they are telling us we did not do what we were suppose to. The original loan modification was denied because they say we didn't supply sufficient documents, which is false, and upon proving that ONCE AGAIN to them, they told my husband they reactivated it, and to continue making the modified payment amount.

We got our latest monthly statement, and it says we don't have a payment due until 9/1/10, so my husband called ONCE AGAIN, and was told that was an error, to make our payment as previously scheduled on May 1st, so we did. We received a certified letter 2 days ago, 5/4/10, telling us we will be foreclosed on in 45 days if we do not pay them $9,314.06 by 4/29/10. when he called about the certified letter, they told him this is on his credit report as being in default, which is false, and the foreclosure notice stands!

http://www.consumeraffairs.com

## VERIFICATION

MALERA TRAYLOR-WRIGHT, pursuant to 28 U.S. C. §1746, declares as follows:

1.  I am a member of the Bar of the State of Alabama.   I serve as an Assistant City Attorney for the City of Birmingham, Alabama.   Among my many duties include providing counsel to the Retirement and Relief System of the City of Birmingham ("Birmingham Retirement System").

2.  I make this verification on behalf of the Birmingham Retirement System, a plaintiff in this shareholder derivative action, which authorizes the filing of this Consolidate Amended Complaint.

3.  The Birmingham Retirement System is a current shareholder and a shareholder during the relevant period of this Consolidated Amended Complaint.

4.  I have reviewed the foregoing Consolidated Amended Complaint on behalf of the Birmingham Retirement System, and I believe the factual allegations herein to be true and correct to the best of my information, knowledge and belief.

Malera Traylor-Wright
Assistant City Attorney
City of Birmingham, Alabama

**VERIFICATION**

I, Michael G. Brautigam, under pain and penalty of perjury under the laws of the United States, aver as the Plaintiff in this shareholder derivative action that I was a Goldman Sachs Group, Inc. shareholder during the relevant times that the even ts alleged to have taken place in this Consolidated Complaint occurred.  Also, I continu to hold my shares.  I believe the factual allegations in the Consolidated Complaint to be true and correct to the best of my information, knowledge and belief.  Having recei ed a copy of this Consolidated Complaint, having reviewed it with my Counsel, I hereby authorize its filing.

Michael G. Brautigam